878 A.2d 628

Arthur H. SPENGLER, Jr.

v.

SEARS, ROEBUCK & COMPANY.

No. 798, Sept. Term, 2004.

Court of Special Appeals of Maryland.

July 11, 2005.

222

224

**226**

B. Robins, IV, Salisbury, for appellant.

Matthew T. Angotti, Baltimore (Jonathan D. Fink, Buchalter, Nemer, Fields & Younger, P.C., on the brief), Los Angeles, CA, for appellee.

Panel: JAMES R. EYLER, SHARER, MEREDITH, JJ.

SHARER, J.

Arthur J. Spengler, Jr., appellant, declined to pay certain credit card debt, which he maintained he did not owe, to appellee, Sears, Roebuck & Company. As a result, Sears reported Spengler's delinquencies to various credit rating agencies, causing impairment to his credit standing.

Spengler filed a four-count complaint in the Circuit Court for Wicomico County, alleging: (1) that he was entitled to a declaratory judgment relieving him of the debt; (2) breach of contract; (3) defamation; and (4) interference with business relations. The trial court granted Sears' motion for judgment as to the breach of contract and defamation counts; Spengler voluntarily withdrew the count for declaratory judgment; and the case went to the jury on the single count of interference with business relations. Favoring appellant, the jury awarded $145,000 in damages. Sears filed a timely motion for judgment notwithstanding the verdict, which, following a hearing, the court granted. Aggrieved at the loss of his favorable verdict, Spengler has noted this appeal.

■■■ Spengler presents for our consideration seven questions, which, as distilled and recast are: [1]

---

1. As presented in his brief, Spengler's issues are:
 1. Was there sufficient evidence from which the jury could have rationally determined that Appellee acted to intentionally interfere with and to damage the business relations of the Appellant?

I. Whether the circuit court erred in granting Sears' motion for judgment on the breach of contract and defamation counts.

II. Whether the circuit court erred in granting Sears' motion for judgment NOV on the interference with business relations count.

III. Whether the circuit court erred in granting Sears' motion for judgment on the claim for punitive damages.

IV. Whether the circuit court abused its discretion in excluding evidence of other lawsuits filed by Sears.

V. Whether the circuit court erred in denying Spengler's request for a spoliation instruction.

Our answer to each of the questions is "No"; thus, we shall affirm.[2]

## FACTUAL BACKGROUND

In 1989, Spengler opened a credit card account with Sears. He added his wife to the account as an "authorized user" in

2. Did the trial judge invade the province of the jury when he removed the issue of the credibility of the witnesses from its consideration in granting Appellee's Motion for Judgment?

3. Did the trial judge erroneously conclude that the replacement of Appellant's Sears Card with a MasterCard account was merely an "upgrade" of an existing account?

4. Did the trial judge invade the province of the jury when he ruled that the replacement of Appellant's Sears Card with a MasterCard account was merely an "upgrade" of an existing account?

5. Did the trial judge err in removing the issue of punitive damages from the jury's consideration?

6. Given the repeated failure of discovery on the part of Appellee, did the trial judge abuse his discretion by refusing to give the spoliation instruction regarding other lawsuits requested by Appellant?

7. Did the trial judge properly exclude evidence demonstrating the extent of lawsuits filed by Appellee in the District Court for Wicomico County, Maryland, to recover delinquent accounts?

**2.** In its brief, Sears raises the issue: "Are Spengler's state law claims preempted or otherwise precluded (in whole or part) by FCRA [federal Fair Credit Reporting Act], 15 U.S.C. §§ 1681h(e), 1681s-2(d) and 1681t?" We conclude that (1) the FCRA does not provide a private cause of action and (2) Spengler's claims are not preempted because he has claimed the existence of "malice or willful intent to injure."

1996. In 1997, in what Spengler asserts was an effort to terminate his account, he paid the account balance and destroyed the account credit card. The last date of purchase on the card was July 17, 1997. In a lapse that would become central to this litigation, Spengler never notified Sears that he wished to close the account—he merely destroyed the card— nor did he ever advise Sears that his wife was no longer an authorized user.

### The User Agreements

The relationship between Spengler and Sears involved three account user agreements, the first in 1996.[3] That agreement provides, in pertinent part:

CHANGE IN TERMS—CANCELLATION. As permitted by law, Sears has the right to change any term or part of this agreement. . . . Sears will send me written notice of any such changes when required by law. Sears also has the right to cancel this agreement as it relates to future purchases. I agree to return all credit cards to Sears upon notice of such cancellation.

\* \* \*

CHANGE OF RESIDENCE: If I change my residence, I will inform Sears.

\* \* \*

AUTHORIZED BUYERS: This agreement controls all charges made on [my] account by me or any other person I authorize to use the account. If I claim that charges are unauthorized, I agree to cooperate with Sears in its reasonable investigation of my claim.

\* \* \*

CREDIT INVESTIGATION AND DISCLOSURE: Sears has the right to ... report the way I pay the account to credit bureaus and other interested parties[.]

\* \* \*

---

3. There is much "fine print" in the agreements. We provide only those portions relevant to this appeal.

If you fail to pay the amount [Sears] think[s] you owe, [Sears] may report you as delinquent. However, if [Sears'] explanation does not satisfy you and you write to [Sears] within ten days telling [Sears] that you still refuse to pay, [Sears] must tell anyone [it] report[s] you to that you have a question about your bill[.]

(Alterations added.)

In 1997, the account agreement was revised, providing in relevant part:

### BASIC AGREEMENT

\* \* \*

ACCEPTANCE AND LIABILITY. I am responsible for all amounts owed on my account. I agree to pay all amounts owed on my account according to the terms of this agreement. This agreement is effective when any account holder or authorized user either uses the account, activates the card, or takes any other action which indicates acceptance of the account or card.

\* \* \*

AUTHORIZED BUYERS. This agreement controls all charges made on the account by me or any person I authorize to use my account. If I believe or claim that any charges are unauthorized, I agree to notify [Sears] immediately ... Unauthorized use does not include use by a person to whom I have given the credit card or authority to use the account and I will be liable for all use by such person. To terminate this authority, I must notify [Sears]. I will attempt to retrieve the credit card from the previously authorized user and return it to [Sears] at the address mentioned above along with a letter explaining my action.

\* \* \*

### PHONE CALLS, CREDIT INVESTIGATION, REPORTING & INFORMATION SHARING

\* \* \*

CREDIT INVESTIGATION AND DISCLOSURE OF INFORMATION.... If I fail to fulfill the terms of this agreement, a negative report reflecting on my credit record may be submitted to a credit reporting agency. I may notify [Sears] by telephone ... if I believe [Sears] has reported inaccurate information regarding my account to a credit reporting agency.

\* \* \*

## FUTURE CHANGES

CHANGE OF TERMS—CANCELLATION. As permitted by law, [Sears] has the right to change any term or part of this agreement, including.... [Sears] will send me written notice of any such changes when required by law. [Sears] also has the right to cancel this agreement as it relates to future purchases or other charges as any time. I agree to return all credit cards to [Sears] upon notice of such cancellation.

CHANGE OF RESIDENCE. If I change my residence, I will inform [Sears].

(Alterations added.)

Finally, the account was again revised in July 1999:

**Section 2. LOANS AND LIABILITY**

\* \* \*

(b) *Liability.* You agree to pay all amounts owed on the Account whether incurred by you, any other account holder, anyone you allow to use the Account or any person from which you receive a benefit. Every person who uses the Card or Account is liable for the use of the Card and Account according to the terms of this Agreement. Court decrees for divorce or separation do not affect liability for any use of the Card of Account.

\* \* \*

**Section 4. AUTHORIZED AND UNAUTHORIZED USE.**

(a) *Authorized Users.* You may ask that an individual be added, deleted or changed as an authorized user ("Authorized User") by calling . . . or writing us. . . . You understand we will issue a Card to each Authorized User. If you terminate this authority, you will retrieve the Card from the Authorized User and destroy the Card. Any Authorized User may use the Account, and may take any action on the Account that you could take, either on behalf of yourself or the Authorized User. You understand that . . . (ii) you are responsible for and will pay all charges made by the Authorized User . . . AND (v) we may, without any liability, accept and act upon the directions and requests of any Authorized User[.]

\* \* \*

**Section 23. CHANGE OF TERMS.** We may, at any time and subject to applicable law:

\* \* \*

Change any term or condition of this Agreement relating to your account . . .

\* \* \*

We will send you a written notice of any such change(s) or addition(s) as required by law.

**Section 24. TERMINATION.** You may terminate this Account at any time by paying all sums due under this Agreement and destroying all cards issued on the Account. We may, at any time without prior notice to you, terminate this Agreement[.]

\* \* \*

**Section 25. YOUR NOTICE OF CHANGES.** You will promptly inform us if you change your name, residence or place of employment. . . . We may continue to send Account Statements and other notices to the last address we maintained on the Account until you notify us of any change.

(Alterations added.)

A significant distinction among the three agreements is that neither the 1996 nor 1997 agreement contains a provision

detailing what an account user must do to terminate an account. The 1999 revision is more precise in that regard.

In January 2001, Spengler and his wife separated, and Spengler moved out of the marital residence. He did not provide Sears with his new address.

A few months later, in approximately March 2001, Sears sent out a bulk mail "campaign mailer" to its account holders, one of which was addressed to the Spengler household where, of course, appellant no longer resided. Because he had not advised Sears of a new address, Spengler did not receive the mailing. The face of the mailer contained the following words: "Congratulations! You have been selected to receive an upgrade to the new Sears Gold MasterCard—offered only to valued customers." Additionally, the mailer provided: "Your upgrade is automatic—there's nothing you need to do. Your Sears Gold MasterCard automatically replaces your Sears Card . . . [I]f you choose not to be upgraded to the Sears Gold MasterCard, you must call us at the number below." On the reverse side of the mailer was the advice: "Sears Gold MasterCard. It automatically replaces your Sears Card."

Spengler's wife received the mailer and activated the new Sears Gold MasterCard. Subsequently, she transferred a balance of $4,446.50 from another credit card.[4] The Sears Gold MasterCard account statement of April 20, 2001, reflects an outstanding balance due of $5,638.43. In some manner, not abundantly clear from the record, Spengler became aware of that statement.

Having learned of the balance, Spengler promptly contacted Sears and did the following: advised Sears of his new address, directed Sears to terminate Mrs. Spengler's "authorized user" status, and requested that Sears cancel the Sears Gold MasterCard. Sears complied by cancelling the account and removing Mrs. Spengler's status as an "authorized" user.

On August 24, 2001, Spengler notified Sears in writing of his refusal to repay the amount on the account. On January 18,

---

4. The Sears Gold MasterCard account Statement for that period (April, 2001) indicated additional purchases made with the Card.

2002, Sears responded, advising Spengler that it had investigated the charges, determined them to be "authorized", and, consequently, reinstated Spengler's liability for the balance. From April 2001, until April 24, 2003,[5] Spengler and Sears exchanged numerous communications, but failed to resolve the issue of the charges.

Because of Spengler's failure to pay the account, Sears reported the delinquency to three credit rating agencies (Experian, Equifax, and TransUnion). Spengler claims that from July 2001, to September 2003, he was repeatedly refused credit.[6]

We shall address additional relevant facts as necessary.

## PROCEDURAL HISTORY

Spengler commenced the instant litigation against Sears on April 24, 2003, when he filed the complaint to which we have referred, *supra,* seeking both compensatory and punitive damages. Sears raised several affirmative defenses, including federal preemption of Spengler's state law tort claims.

Trial commenced, and was concluded, on May 27, 2004. Spengler called five witnesses—himself, his two daughters, Jai Holtz (a Sears representative), and Evan Hendricks. The latter was qualified as an expert in the field of "credit scores, credit reports, how the [credit] system works, how to read and interpret credit reports, Fair Credit Reporting Act issues, including consumers' rights and duties on credit grantors reporting data." [7]

The testimony was brief—Spengler described his surprise at learning of the account balance and his efforts to avoid the responsibility for the account. Holtz described the dispute

---

**5.** The record contains telephone records of the communication between Sears and Spengler.

**6.** Spengler avers that he applied for credit cards from, but was denied by, Chase Manhattan Bank, MNBA Visa, and CitiBank. He also claimed to have been denied a small loan by M & T Bank.

**7.** We quote counsel's proffer of Hendricks's area of expertise.

from the Sears perspective. Spengler's daughters testified as to the emotional upset suffered by their father as a result of the dispute. Hendricks's testimony, although more substantial than that of other witnesses, offered, as a matter of fact, what is not disputed—that, as a result of the delinquency, Spengler's credit rating had been seriously impaired.[8] He offered no opinion that Sears had conducted the transactions contrary to established standards in the industry, or that Sears had singled Spengler for extraordinary treatment.

At the conclusion of Spengler's case, Sears moved for judgment on all four counts and the punitive damages claim. The circuit court granted the motion as to the punitive damage claim and breach of contract count, but reserved its ruling on the defamation and interference with business relations counts. At that time, Spengler dismissed his declaratory judgment count.

Sears called no witnesses and renewed its motion to the remaining counts. The court granted the motion as to the defamation count, but reserved its ruling as to the interference count, and permitted the jury to consider that count. The jury returned a verdict for Spengler on the interference count, awarding $45,000 in economic damages and $100,000 in non-economic damages.

Pursuant to Md. Rule 2–532, Sears moved for judgment notwithstanding the verdict. The court convened a hearing on May 28, 2004, and, on June 3, 2004, in a written opinion and order, granted the motion.

## DISCUSSION

*I. Whether the circuit court erred in granting Sears'
motion for judgment on the breach of contract and
defamation counts.*

We conclude that the circuit court appropriately granted Sears' motion for judgment as it relates to the count of breach

---

8. Hendricks testified that Spengler's credit had been "ruined." That may have been an overstatement, for Spengler conceded that he had later been extended credit, albeit with a co-signer.

of contract and defamation. We address each count in turn, *infra.*

## Standard of Review

Md. Rule 2–519 provides:

(a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence . . .

(b) **Disposition.** When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. When a motion for judgment is made under any other circumstances, the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

Md. Rule 2–519(a), (b) (2005) (alterations added).

In reviewing the grant of a motion for judgment, we "assume the truth of all credible evidence on the issue, and all fairly deducible inferences therefrom, in the light most favorable to the party against whom the motion is made." *Orwick v. Moldawer,* 150 Md.App. 528, 531, 822 A.2d 506 (2003) (citing *Nissan Motor Co. Ltd. v. Nave,* 129 Md.App. 90, 116–17, 740 A.2d 102 (1999)). Consequently, we "may affirm the grant of the motion for judgment only if . . . we conclude that there was insufficient evidence to create a jury question." *Wilbur v. Suter,* 126 Md.App. 518, 528, 730 A.2d 693 (1999) (alterations added) (citing *Nationwide Mut. Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 189, 702 A.2d 422 (1997)).

## *Breach of Contract*

The essence of a credit card account is the facility of payment for purchases made by the cardholder. Businesses need not maintain numerous customer accounts as in times past; rather, all charges flow through the credit card company

to the cardholder. The vendor is paid on a timely and regular basis by the card issuer, less a commission to the issuer for its collection services. The cardholder and the card issuer, in turn, contract regarding use of the credit card and terms of payment.

Sears and Spengler contracted in 1989. Sears offered to extend credit to Spengler, subject to his credit level and maintenance of timely payment. Spengler accepted that offer. Subsequently, Spengler expanded the terms of the contract by adding his wife to the account as an "authorized user." [9] Sears accepted the expanded terms. Spengler later sought unilaterally to terminate the agreement; however, he did not do so in compliance with the terms of the contract.

The facts relevant to that issue are undisputed. In 1997, Spengler destroyed the credit cards, paid the balance then due, and requested that his wife notify Sears that he wished to terminate the account. She did not do so. In 2001, as we have seen, Spengler moved out of the marital residence. Mrs. Spengler remained in the marital home. To his ultimate detriment, Spengler did not advise Sears of his change of address, believing that he had terminated the credit card contract some years before.[10]

The events that led to Spengler's subsequent liability on the account occurred some time in 2001, when Sears mailed, unsolicited, and apparently in bulk, to Sears credit card holders, offers for the "new Sears Gold MasterCard." One of the offers was mailed to Spengler at the address that Sears had

---

**9.** The 1996–97 agreements provide that the primary cardholder is liable on the amount owed on the card. Both agreements recognize that changes may include "authorized" use. Where a primary cardholder believes charges are not "authorized", he may dispute the charges. Otherwise, he is liable for the amount. We note that neither the 1996 nor 1997 user agreements provide for separate liability for an authorized user. Moreover, the 1997 agreement goes as far as saying that, a primary cardholder "will be liable" for authorized use. Finally, Sears' placement of authorized user provisions demonstrates that such users are permissible under the agreements.

**10.** Apparently, between 1997 and 2001, the account was dormant.

for him—what had been his residence before the separation. The notice provided: "Your upgrade is automatic—there's nothing you need to do. Your Sears Gold MasterCard automatically replaces your Sears Card ... [I]f you choose not to be upgraded to the Sears Gold MasterCard, you must call us at the number below." Thus, the burden, and the ability, to reject the offer was on the cardholder.

The reverse side of the mailer stated: "Sears Gold Master-Card. It automatically replaces your Sears Card." The new Sears Gold MasterCard permitted an account holder to use the card anywhere that MasterCard was accepted, thereby permitting greater purchasing options in the form of non-Sears purchases and transfers of existing non-Sears' card balances.[11]

Spengler, no longer living at his former home, and not having advised Sears of his new address, did not receive the offer.[12] Mrs. Spengler did receive the offer and, as an "authorized user," accepted by activating the new Sears Gold MasterCard. She subsequently accrued significant debt on the Sears Gold MasterCard, by both transferring a balance from another card and making new purchases.[13]

Spengler argues that the facts constitute sufficient evidence to generate a jury question as to a breach of contract. He posits that the jury could find that: (1) the Sears Gold MasterCard account was a new product and not simply an upgrade of an existing account; (2) Spengler had validly terminated the Sears account in 1997 and, therefore, there existed no account to upgrade; and (3) Sears allowed the

---

**11.** Indeed, the new Sears Gold MasterCard is, according to the mailer, "accepted at 18 million locations around the world."

**12.** Spengler conceded, on cross-examination, that he failed to notify any of his creditors, or the Postal Service, of his change of address.

**13.** The balance was transferred from a Fleet Finance credit card, as to which Spengler was also an authorized user. The record is not conclusive as to whether any portion of that balance was the result of charges made by him.

authorized user to exceed the powers, if any, conferred upon her by him as the primary account holder.[14]

In the breach of contract count of his complaint, Spengler asserts:

13. [Sears] breached its obligations to [Spengler] under the Sears Card by allowing Joyce Spengler to make retail purchases from merchants other than [Sears] and to obtain extensions of credit, including transfers of her individual debt to [Spengler's] account. . . .

14. [Sears] breached its obligations to [Spengler] under the Sears Card by failing and refusing to reverse and to otherwise nullify the unauthorized extensions of credit under the . . . MasterCard account established in [Spengler's] name.

By the terms of the 1996 agreement, Spengler, as the cardholder, agreed, *inter alia*, to be responsible for charges made by authorized users. He also agreed to notify Sears of a change of address. Those promises were ratified in the 1997 amendments to the contract. The 1999 amendments to the account contract provided, for the first time, that an account could be terminated by the card-holder by (1) payment of the balance due and (2) destruction of the cards. That is, of course, what Spengler had done in 1997, thinking, mistakenly, that he had terminated the account.

■ Spengler argues that the 1999 amendments to the contract were not relevant to his account, maintaining that he had no account after 1997 when he destroyed his Sears cards. That position, we conclude, lacks merit. As we have explained, having done nothing under the terms of the contract to terminate the account, or to remove his wife as an authorized user, the account remained active, although unused for some period of time. Each of the agreements authorized Sears to amend the terms of the credit card use, providing

---

14. In other words, Sears conferred a power of non-Sears' purchases on Spengler's wife for which Spengler had not originally contracted.

notice was given to the cardholder. In each instance, Sears gave the requisite notice.

It is difficult to view the instant record without concluding that Spengler's *own* inaction resulted in the continuation of the account. Spengler, in 1997, both failed to notify Sears that he intended to terminate the account, and to verify that Mrs. Spengler had notified Sears of the termination, as he had requested of her. Sears had no reason to be aware that the account was other than viable.[15]

■■ "The interpretation of a written contract is ordinarily a question of law for the court and, therefore, is subject to *de novo* review by an appellate court." *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 250, 768 A.2d 620 (2001). "Where the language of the contract is unambiguous, its plain meaning will be given effect. There is no need for further construction." *Aetna Cas. & Sur. Co. v. Ins. Com'r*, 293 Md. 409, 420, 445 A.2d 14 (1982).

We concur in the trial court's implicit finding that the contracts were unambiguous and thus susceptible to its ruling as a matter of law.

### Defamation

Spengler's complaint in defamation stated:

17. [Sears] has made false statement to divers [sic] persons and entities concerning the credit history of the credit account which [Spengler] established with [Sears]. The falsity of the statements was known to [Sears], and, with malice and with the intention of causing harm to [Spengler], the false statements regarding [Spengler's] credit history were published in such a manner as to maximize the damage to [his] credit reputation.

18. [Sears] made ... statements [about Spengler's late payment history] with actual malice and with knowledge of

---

15. Indeed, Spengler's failure to notify Sears of his change of address after he moved from the marital residence may well constitute a breach of the user agreements.

their falsity and for the purpose of discouraging others to extend credit to or to otherwise have business dealings with [Spengler].

At the conclusion of plaintiff's evidence, Sears moved for judgment on the defamation count. The trial court reserved its ruling at that time but, by granting the motion at the close of all the evidence, effectively ruled that, there having been no breach of contract, the reports by Sears were not untruthful.

Spengler asserts in his brief that "there was an abundance of evidence from which a rational mind could have found the requisite intent to harm" in the reports by Sears to the three credit rating agencies.[16]

> With respect to defamation, the Court of Appeals iterated: Under Maryland law, to present a prima facie case for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; *and* that the plaintiff thereby suffered harm.

*Gohari v. Darvish,* 363 Md. 42, 54, 767 A.2d 321 (2001) (emphasis added); *see also Peroutka v. Streng,* 116 Md.App. 301, 311, 695 A.2d 1287 (1997) (listing elements of defamation).

 For the purposes of defamation, "[a] false statement is one that is not substantially correct." *Batson v. Shiflett,* 325 Md. 684, 726, 602 A.2d 1191 (1992). Additionally, "the burden of proving falsity rests upon the plaintiff[.]" *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 597, 350 A.2d 688 (1976). Indeed, if a plaintiff cannot prove the falsity of a particular statement, the statement will not support an action for defamation. *See Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md.App. 470, 510, 665 A.2d 297 (1995).

---

**16.** We do not have the benefit of the agreements between Sears and the credit reporting agencies. Presumably, in return for providing information to those who extend credit to consumers, the agencies require those credit extenders to provide accurate account information about their card-holders. Otherwise, we see little use for central credit history repositories.

■ The crux of Spengler's argument is that Sears reported his delinquencies to the credit agencies, but failed to indicate that he "disputed" the charges. As a result of this omission, according to Spengler, the reporting was false and constituted defamation. Spengler bore the burden of proving those assertions.

When Spengler learned, in 2001, of the existence of the Sears Gold MasterCard, and the charges to the account, he notified Sears and disputed his liability for the balance. In response, Sears promptly removed the "delinquency" designation and undertook an investigation. The investigation included a report to the local police department, based on Spengler's allegation that Joyce Spengler had committed credit card fraud, and a review of its own records. Having quickly determined that there was no fraud, and that Joyce Spengler was, in fact, an authorized user of the card, the "delinquency" status was reinstated. In due course, reports of the delinquency were made to the credit reporting agencies. Spengler continued to complain to Sears and dispute the account but, according to the evidence developed through Jai Holtz, Sears' senior credit manager, Spengler provided no new or additional information in the subsequent reports.[17]

We find nothing in the record that would support the elements of a defamation cause of action. Sears, upon Spengler's complaint, undertook an investigation based on the information provided by Spengler. Sears then, having determined that the charges to the MasterCard were made by an authorized user, reported the delinquency, in the usual manner of the trade, to the credit rating agencies. Nothing that Sears reported was false. To the contrary, the reports contained information that was substantially correct. While it may be true that Spengler suffered emotional upset as a result of the experience, there is nothing in the record to support a finding that it was caused by a false or illegal report by Sears.

---

17. Holtz was called as Spengler's witness.

We agree with the trial court's assessment that Spengler failed to offer evidence sufficient to create a jury question.

## II. Whether the circuit court erred in granting Sears' motion for judgment NOV on the interference with business relations count.

■■■ As in our review of a motion for judgment, "a motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence and is reviewed under the same standard as a motion for judgment made during trial." *Nationwide Mut. Fire Ins. Co. v. Tufts, supra,* 118 Md.App. at 190, 702 A.2d 422. We have set out that applicable standard of review in Section I, *supra.*

### Interference With Business Relationships

■■■■ Maryland recognizes the tort of interference with business relationships. *See e.g., Kaser v. Fin. Prot. Mktg., Inc.,* 376 Md. 621, 831 A.2d 49 (2003); *Bagwell, supra,* 106 Md.App. 470, 665 A.2d 297. The elements of the tort are: " '(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.' " *Bagwell, supra,* 106 Md.App. at 504, 665 A.2d 297 (quoting *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.,* 336 Md. 635, 652, 650 A.2d 260 (1994)). A plaintiff must satisfy all of the aforementioned elements.

We have said:

Tortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There must also be proof that the defendant's conduct in interfering with contract or business relations was accomplished through *improper means.* Consequently, to recover for tortious interference with business or contractual relationships, the defendant's conduct must

be "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships."

*Lyon v. Campbell,* 120 Md.App. 412, 431, 707 A.2d 850 (1998) (citations omitted) (emphasis added) (quoting *Alexander, supra,* 336 Md. at 657, 650 A.2d 260).

Expanding on the issue of "improper means", the Court of Appeals recognized:

> The types of unlawful means which "have been held to result in liability" for interference with [business relationships] were listed by Dean Prosser. They are "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith[.]"

*K & K Mgmt., Inc. v. Lee,* 316 Md. 137, 166, 557 A.2d 965 (1989) (internal citations omitted).

### Improper Means

 This Court has limited "improper means" to those acts above described. *Volcjak v. Washington County Hosp. Ass'n,* 124 Md.App. 481, 512–13, 723 A.2d 463 (1999) (the party to the litigation "correctly asserted" that the types of wrongful acts that have established liability for the tort of interference with business relations have been limited to violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith). Within that context, we have also "declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has an incidental effect on the plaintiff's business relations with third parties." *Id.*

To prevail in a complaint for interference with business relationships, a plaintiff must prove that improper means were employed by the defendant. In Count Four of his initial Complaint ("Interference With Business Relations"), Spengler alleges:

20. The allegations of fact set forth in the foregoing paragraphs [including Count Two, Breach of Contract, and Count Three, Defamation] are incorporated into this Count Four.

21. The false statements made by [Sears] concerning the credit history of [Spengler] were designed and calculated to interfere with [Spengler's] economic relationships, his business relations and economic rights; they were made by [Sears] with the unlawful purpose of causing damage to [Spengler], with the intent to cause injury to him, and were without justifiable cause.

22. As a direct and proximate cause of the false statements, [Spengler] has suffered damages.

From his complaint, we glean that Spengler's allegation of "improper means" rests on either breach of contract or defamation. He makes no allegation of willfulness, which is an element of the tort.

■■■ As we have explained, *supra*, Spengler has failed to provide sufficient evidence to create a jury question as to either breach of contract or defamation. Consequently, his allegation is not supported by either breach of contract of defamation. Nor can we conclude that Sears was responsible for any *independently wrongful or unlawful conduct* sufficient to constitute the requisite "improper means." Each of the three account user agreements provides that Sears may report an account holder's delinquency to credit agencies. As Spengler was clearly in default, the report by Sears was contractually permissible.

■■■ Assuming, *arguendo*, that Spengler established a sufficient claim for either breach of contract or defamation, or that Sears' actions were somehow "independently wrongful or unlawful," we would still conclude that Spengler has failed to demonstrate the elements of the tort of interference with business relationships.[18]

---

18. Spengler also asserts that Sears' alleged violation of the FCRA is sufficient to constitute the requisite "improper means," but cites no

## The Elements of Interference with
## Business Relationships

As we have noted, the elements of tortious interference with business relationships are: (1) intentional and willful acts (2) calculated to cause damage to a plaintiff's lawful business that are (3) done with the unlawful and malicious purpose to cause damage, and that (4) cause actual damage.

We note first that, without doubt, Sears *intentionally* reported Spengler's delinquency to the various credit rating agencies. It did so in the ordinary course of its business of reporting account status to those agencies. Lacking from the evidence, however, is any notion of willfulness, unlawful purpose, or conduct calculated to cause damage.

Spengler makes numerous contentions:[19] (1) prior to the "dispute," he had enjoyed excellent credit; (2) Sears' "severely damaged" his credit score when it reported his delinquencies; (3) Sears failed to list in its report that he "disputed" Sears' conclusion of delinquency; (4) Sears acted in contravention of not only the applicable federal law (Fair Credit Reporting Act "FCRA"), but also its own policies and procedures of reporting delinquency, by not reporting that the delinquency was disputed; (5) CitiBank (one of the businesses to deny Spengler credit subsequent to Sears' report) itself reported the claim as "disputed", thereby demonstrating Sears' deliberate falsification of its own documents and violation of the FCRA; (6) Sears did not list the account as "disputed" because it knew that Spengler could successfully defend the claim in court, concluding from that assertion that Sears intended to harm his credit reputation; and (8) Sears' alteration of its account history (failing to list account as "disputed") demonstrates intent to hurt Spengler *specifically.*[20]

---

authority that a violation of a civil federal statute satisfies the "improper means" requisite of the interference tort.

**19.** We have attempted to summarize Spengler's contentions here into a more orderly context.

**20.** During a conference with the trial judge, at which legal aspects of the punitive damage claims were being argued, Spengler's counsel said:

Such contentions, if supported by sufficient competent evidence, might well establish liability under the tortious interference theory. Spengler's evidence, however, fell far short of proof that Sears, in a calculated manner, intended to harm his credit relations by reporting his delinquency to the credit rating agencies. We reiterate that, upon receiving Spengler's complaint, Sears investigated his claim, both internally and by contact with the local police, finally concluding that the dispute lacked merit. Sears then, with justification, and in the ordinary course of the trade, reported Spengler's delinquency to the appropriate sources. The evidence was insufficient, both directly and inferentially, to sustain proof of malice.

### III. Whether the circuit court erred in granting Sears' motion for judgment on the claim for punitive damages.

At the conclusion of Spengler's case, and essentially at the end of all the evidence, since Sears offered no evidence, the court granted Sears' motion for judgment as to punitive damages. In ruling, the court noted the evidence "is well short of what is required to lay factual predicate for an award of punitive damages in either of the counts in which it is claimed...." We agree with the trial court's assessment.

Maryland law permits punitive damages exclusively in tort actions. *Bowden v. Caldor, Inc.,* 350 Md. 4, 22, 710 A.2d 267 (1998). As a general rule, a jury may award punitive damages only when a plaintiff has established "actual malice" on the part of the defendant. *Darcars Motors of Silver Springs, Inc. v. Borzym,* 379 Md. 249, 264, 841 A.2d 828 (2004). "Actual malice" is defined as "[a] sense of conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud." *Montgomery Ward v. Wilson,* 339 Md. 701, 733, 664 A.2d 916 (1995). Moreover, "in a defamation

---

Your Honor, counsel keeps referring to ill-will, that type of thing. We are not saying they had ill-will. They didn't even know Spengler. He was a number.

Counsel made the same assertion at oral argument.

action, the plaintiff must establish that the defamatory falsehood was made with actual knowledge that it was false." *Bowden, supra,* 350 Md. at 23, 710 A.2d 267. Finally, the standard for an award of punitive damages is "clear and convincing evidence." *Darcars, supra,* 379 Md. at 264, 841 A.2d 828. To satisfy this standard, a plaintiff must persuade the jury that the truth of his contention is "highly probable", not "merely probable." *Hoffman v. United Iron & Metal Co., Inc.,* 108 Md.App. 117, 146–47, 671 A.2d 55 (1996) (citing *ACandS, Inc. v. Godwin,* 340 Md. 334, 374 n. 11, 667 A.2d 116 (1995)).

Spengler failed to provide evidence that Sears' report to the credit rating agencies was not substantially correct. As we iterated in Part III, *supra,* there is nothing in the evidence that would lead to an inference of malicious or willful conduct on the part of Sears, with the precise intent to harm Spengler.

### IV. Whether the circuit court abused its discretion in excluding evidence of other lawsuits filed by Sears.

It was Spengler's intent to introduce to the jury evidence, obtained from the records of the District Court for Wicomico County, that Sears had "no reluctance in instituting suit against its delinquent customers." From that evidence, and from the fact that Sears did not sue him to collect the overdue account, Spengler argues, the jury could have concluded that Sears recognized the lack of merit to its claim of his liability. Sears moved, *in limine,* to exclude that evidence. In granting the Sears motion, the court observed that, "on the merits of the issues that are presented", the proffered evidence had "really no valid probative value."

It is well established that "the admission or exclusion of evidence is within the sound discretion of the trial court." *Thompson v. State,* 139 Md.App. 501, 515, 776 A.2d 99 (2001) (quoting *Cleveland v. State,* 8 Md.App. 204, 207, 259 A.2d 73 (1969)). Md. Rule 5–401 (2005) defines probative or "relevant" evidence as "evidence tending to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Indeed, "all relevant evidence is admissible." Md. Rule 5–402. However, "[relevant] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5–403.

■■■ At the time at which Sears' counsel became aware of appellant's intent to introduce the District Court records, jury selection was about to commence. The records had not been provided in discovery, nor was there any prior indication of Spengler's intent to offer such proof. Hence, considerable delay would have been required to give Sears' counsel the opportunity to become acquainted with each of the 33 sets of court records. Moreover, we agree with the trial court's assessment that counsel was "getting a little far afield" with the proffered evidence. Why Sears would choose to file suit against customer X, but not against customer Y, would potentially, if not probably, result in a confusion of issues. The District Court records would not have revealed what is the essence of Spengler's claim—whether (and if so, in what manner) Sears reported any, or all, of the delinquencies represented by the 33 lawsuits to a credit agency. We find no abuse of discretion in the trial court's grant of the motion *in limine*.

### V. Whether the circuit court erred in denying Spengler's request for a spoliation instruction.

■■■ In pre-trial discovery, Spengler sought to obtain disclosure of other similar lawsuits filed against Sears, subsequent to 1996. Sears filed a motion for protective order, which was denied by the court. Nonetheless, Sears declined to provide such information, asserting that it would require a search of nearly every jurisdiction in the country. Spengler issued a subpoena for such information, which was responded to by a motion to quash. That motion was likewise denied. Notwithstanding those actions, Sears did assemble documents

that were available at the time of trial. Spengler requested that the court instruct the jury on spoliation.[21] The court declined to give such instruction. We find no error.

Jury instructions are covered by Md. Rule 2–520. "When requested by a party, the court has a duty to instruct the jury on that party's theory of the case, provided the proposed instruction is supported by the facts...." *Mallard v. Earl,* 106 Md.App. 449, 469, 665 A.2d 287 (1995). Conversely, the court is not obliged to instruct the jury on issues not generated by the evidence.

The extant record discloses nothing that would support a spoliation instruction. Counsel did not renew the request for production of the records, nor did he proffer to the court what the records of lawsuits in other jurisdictions, had they been available, would have added to the theory of his case. Additionally, we note that the lack of a spoliation instruction did not impair Spengler's claim in the eyes of the jury, since it returned a substantial verdict in his favor. Even had he been entitled to the instruction, we fail to see how he was prejudiced by the court's having declined to give it.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**

---

21. Spengler requested that the court instruct pursuant to Maryland Civil Pattern Jury Instructions, 1:8.