984 A.2d 361

**BRASS METAL PRODUCTS, INC.**

v.

**E–J ENTERPRISES, INC. et al.**

**No. 1580 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

Nov. 30, 2009.

that event followed this one, that event must have been caused by this one."

312

314

316

Robert G. Landolt, Columbia, MD, for Appellant.

John P. Lynch (Charles H. Henderson, McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A., on the brief), Greenbelt, MD, for Appellee.

Panel: HOLLANDER, GRAEFF and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

GRAEFF, Judge.

This appeal arises from a dispute between appellant, Brass Metal Products, Inc. ("Brass Metal"), and appellees, E–J Enterprises, Inc. ("E–J Enterprises") and its President, Eric Johnson. E–J Enterprises, a wholesale metal distributor, entered into an agreement with Brass Metal to provide "just-in-time" inventory services, which entailed purchasing aluminum railings directly from aluminum extrusion mills, storing these railings, and selling them to Brass Metal as needed. The railings were designed by Brass Metal's owner and President, James Burger, but Mr. Burger did not patent his railing designs.

In April 2006, E–J Enterprises sold railings that were being held for Brass Metal to another company, Parthenon Installations ("Parthenon"). Thomas Martin, a Brass Metal salesman, owned a majority interest in Parthenon. In July 2006, when Mr. Burger discovered that Parthenon had established a manufacturing facility that was a "duplicate" of his facility,

Mr. Burger fired Mr. Martin. Mr. Burger then requested that E–J Enterprises stop selling railings based on Mr. Burger's design to Parthenon. E–J Enterprises declined Mr. Burger's request.

In October 2006, Brass Metal filed a complaint in the Circuit Court for Howard County against E–J Enterprises, Mr. Johnson, Parthenon, Mr. Martin, and Anastasios Pantoulis, part-owner of Parthenon, requesting injunctive relief and damages. Prior to trial, Brass Metal settled with Parthenon, Mr. Martin, and Mr. Pantoulis, and they were dismissed from the case. Trial proceeded against E–J Enterprises and Mr. Johnson. On August 22, 2008, after six days of trial, at the close of Brass Metal's case, the circuit court granted appellees' motion for judgment.

Brass Metal appealed. It presents five questions for our review, which we have reorganized and rephrased:

1. Did the circuit court err in granting appellees' motion for judgment on Count I, conversion?

2. Did the circuit court err in granting judgment on count II, tortious interference with contract, on the ground that there was insufficient evidence to present to the jury regarding damages or the existence of contracts with third parties?

3. Did the circuit court err in granting appellees' motion for judgment on counts IV, V, VII, VIII, and IX, which asserted claims for injurious falsehood, civil conspiracy, false representations, non-disclosure or concealment, and constructive fraud and misrepresentation?

4. Did the circuit court err in precluding Brass Metal from using the term "trade secret" in front of the jury and in finding that the Maryland Uniform Trade Secret Act ("MUTSA") preempted a common law claim for misappropriation of trade secrets?

5. Did the court err in excluding from evidence: (1) two depositions; and (2) a non-disclosure agreement between Mr. Martin and Mr. Burger?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Brass Metal is a manufacturer and distributor of aluminum railing products. Mr. Burger, President of Brass Metal, testified that he designed several aluminum railings for his company to sell. The railing system had interchangeable caps, which were named the Jersey Cap, the Senate Cap, the Waverly Cap, the Snap Cap, the Top Rail Cap, the Winchester Cap, the Maryland Cap, and the Slimline Cap, and each had a different shape and design. No patent was obtained for the designs of these aluminum railings. There was testimony that the shapes of at least some of these railings were similar to others in the aluminum industry.

Brass Metal purchased its aluminum railings from four different mills: Tifton; Loxcreen; Bonnell; and Pennex. The mills created Mr. Burger's aluminum railings using an extrusion process. Brass Metal described this process as making "a shape by forcing the metal through a die or mold to give the railing its specific design."[1] A die is a tool or device "for imparting a desired shape, form, or finish to a material." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 628 (2002).

Mr. Burger testified that, per his agreements with the mills, Brass Metal was the only company that was allowed to "run the material" from his dies, and "if [he] wanted anybody else to have access to that material, [he] would have to give written permission . . . to allow [the mills] to take materials of those d[ies] and shapes."[2] Once a die was created, the mill retained

---

1. Extrusion is the "[o]peration of forcing copper, aluminum, magnesium, their alloys or plastics at the optimum temperature through a die to manufacture specific shapes such as rods, tubes, and various hollow or solid sections." SCIENCE & TECHNOLOGY ENCYCLOPEDIA 194 (Univ. of Chicago Press ed. 2000).

2. Mr. Burger testified that five of his designs appeared in Loxcreen's catalog, but Loxcreen was prohibited from selling his designs "in the

possession of the die. Mr. Burger testified that he chose these mills because he received assurances that his "designs were going to be protected, and the designs and profiles were not going to be copied or distributed anywhere else."

In 1999, Mr. Martin contacted Mr. Burger to discuss the possibility of purchasing Brass Metal and operating the business. Mr. Burger was concerned that Mr. Martin lacked the money to purchase the business and the necessary experience in the industry. Mr. Burger and Mr. Martin agreed that Mr. Burger would train Mr. Martin, which he did for approximately a year and a half, during which time Mr. Martin was not paid.

In March or April 2001, Mr. Burger formally hired Mr. Martin as a salesperson for Brass Metal. Mr. Burger initially paid Mr. Martin through his company, Thomas Martin & Associates, $5,000 per month. This was subsequently increased in 2002 to $8,000 per month. Brass Metal did not provide Mr. Martin with any employment benefits. During the time that Mr. Martin worked for Brass Metal, he also worked for three other companies.

In 2001, Mr. Martin's son-in-law, Mr. Pantoulis, created Parthenon Installations, a company that provided installation services for Brass Metal's clients. Because Brass Metal did not provide installation services, Brass Metal would direct customers who requested installation services to Parthenon or one of the other two companies that performed installation work for Brass Metal. The companies that provided installation services for Brass Metal would install the railings and, once the companies received payment from the customer, they would pay Brass Metal for the railings. If a customer wanted to purchase the railings without installation services, it would purchase the railings directly from Brass Metal.

---

Delmarva area," Brass Metal's "primary area of manufacturing and distribution." In exchange, Loxcreen gave Mr. Burger "credit against more profiles being generated to offset the cost."

Mr. Burger had been purchasing general materials for the railings from E–J Enterprises beginning in 1986 or 1987. In 2002, E–J Enterprises and Brass Metal agreed that E–J Enterprises would provide "just-in-time" inventory services for Brass Metal. E–J Enterprises became the exclusive supplier for Brass Metal's products, which involved ordering Brass Metal's products from various mills, stockpiling the railings, and supplying the material to Brass Metal as needed. Pursuant to this agreement, Brass Metal was required to pay E–J Enterprises for the inventory within 30 days of delivery to Brass Metal. Mr. Burger sent letters to Bonnell, Loxcreen, and Pennex authorizing these mills to sell E–J Enterprises' railings based on the dies created for Mr. Burger's designs.[3] Mr. Burger testified that he advised E–J Enterprises that he would "buy all the dies that [E–J Enterprises] would need for [his] usage so [he] could keep control."

In 2003, Mr. Martin and Mr. Pantoulis met with Mr. Burger to revisit the issue of purchasing Brass Metal. Mr. Burger did not agree to sell the business to Mr. Martin.

In 2004, Mr. Martin purchased a 60 percent interest in Parthenon. Mr. Martin did not advise Mr. Burger that he purchased a controlling interest in this company.

In 2005, Mr. Martin visited E–J Enterprises' offices and advised Mr. Johnson that "he was planning to build a manufacturing facility to manufacture railing," and "he would like for E–J to do for his company what they did for Brass Metal Products." Mr. Johnson testified that, initially, he declined Mr. Martin's offer, and he instructed his wife, who was E–J's contact with Brass Metal, to advise Mr. Burger about Mr. Martin's proposal.

In March 2006, Mr. Johnson reconsidered his earlier decision and decided to supply Parthenon with aluminum railings. Mr. Martin provided E–J Enterprises with drawings for the

---

3. The letter to Pennex authorized Pennex to sell E–J Enterprises railings made from the die titled "Basic Snap Rail" and "1.650 Snap Cover" "at whatever pricing Pennex and E–J have agreed upon without further contact or confirmation from [Brass Metal]."

railings. E–J Enterprises determined that, once Parthenon paid for the rights to a die that was identical to that used to make the designs sold by Brass Metal, E–J Enterprises could immediately sell the identical railings in its inventory to Parthenon, as long as it could supply Brass Metal with the inventory it needed. E–J Enterprises provided an invoice to Parthenon, which included a "die service charge." After Parthenon paid the invoice, in April 2006, E–J Enterprises began to supply Parthenon with railings from its inventory.

In July 2006, Mr. Burger required that Parthenon purchase railings on a cash on delivery basis. Parthenon was not paying Brass Metal for the materials it installed in 30 days, as agreed. Rather, it was waiting to pay until 120 to 150 days after completing the work. After Parthenon was "put on a COD" status, it did not purchase any more railings from Brass Metal.

That same month, Mr. Burger learned that Mr. Martin and Parthenon had set up a "separate operation" to manufacture railings. Mr. Burger went to the address, and he discovered a "duplicate of [his] operation," which he described as six people "cutting, punching, welding . . . and powder coating, and all . . . [his] shapes were sitting there on the racks." After he discovered this facility, Mr. Burger terminated Mr. Martin's employment as a salesman with Brass Metal.

Mr. Burger called Mr. Johnson to learn "how Tom had gotten my materials." Mr. Johnson advised Mr. Burger that he had sold Parthenon the materials. Mrs. Johnson subsequently asked if she and her husband could go to dinner with Mr. Burger and his wife to talk about the situation.

On July 21, 2006, Mr. Burger and his wife met for dinner with Mr. and Mrs. Johnson to discuss the business relationship between Brass Metal and E–J Enterprises. Mr. Burger was upset that E–J Enterprises was supplying Mr. Martin's company with what he believed to be his railings, based on the shapes designed by him. He asked Mr. Johnson to stop selling aluminum railings to Mr. Martin, but Mr. Johnson refused.

In a letter dated August 30, 2006, Mr. Burger advised Pennex that it "revoke[d] the right" of E–J Enterprises to "order material" from his dies. Mr. Burger further advised that "[d]uplication of these shapes by E–J or anyone else would constitute infringement of our proprietary products." Mr. Burger similarly advised Pennex that E–J Enterprises was no longer permitted to purchase material based on Mr. Burger's designs.

On October 19, 2006, Brass Metal filed a complaint in the Circuit Court for Howard County against E–J Enterprises, Parthenon, Mr. Martin, Mr. Johnson, and Mr. Pantoulis. Brass Metal alleged the following claims: (1) breach of employment contract/obligation; (2) civil conspiracy; (3) breach of employment obligation; and (4) injunctive relief.[4]

On January 23, 2007, Brass Metal filed a first amended complaint, which did not reference the initial complaint.[5] Count I alleged that the defendants converted Brass Metal's "trade secrets, confidential information, unique dies, Product, customers and contracts[.]" Count II alleged that the defendants "deliberately interfered with/or converted several contracts of Plaintiff, including a lucrative NV Homes contract, for their sole benefit and to cause injury to Plaintiff. . . ." Count III alleged that the defendants "interfered with the economic relationships" of Brass Metal "by both interfering with contracts" and "by working with suppliers and extruders, wrongfully using Plaintiff's trade secrets, confidential information, dies, designs and business acronym (ACRS) to deceive said entities into believing that Architectural Columns and Rails Systems (ACRS), owned by Defendant Parthenon, was

---

4. There was a separate lawsuit involving Brass Metal and E–J Enterprises in Anne Arundel County, which settled prior to trial in this case.

5. We note that "an amended complaint complete in itself, without reference to the complaint that preceded it, replaces an earlier complaint in its entirety, and the earlier complaint is regarded as withdrawn or abandoned." *Priddy v. Jones*, 81 Md.App. 164, 169, 567 A.2d 154 (1989), *cert. denied*, 319 Md. 72, 570 A.2d 864 (1990).

in fact Advanced Columns and Rails Systems (ACRS)."[6] Count IV alleged that the defendants engaged in "injurious falsehood" when they "falsely represented to customers, suppliers and extruders" that Brass Metal's "proprietary dies, designs and railings . . . were properly available to Defendants for sale[.]" Count V alleged that the defendants engaged in a civil conspiracy to interfere with and convert Brass Metal's property, which involved "deceiving customers and suppliers regarding the ownership of trade secrets, confidential information, dies, Product and contracts . . . ." Count VI alleged that the defendants knowingly made "false representations" with the intent "that Plaintiff would act in reliance on said false representations[.]" Count VII alleged that the defendants made false representations and "intentionally created in the mind of customers, suppliers and extruders untrue and misleading material facts," which included "the representation [that] the Defendants were rightfully entitled to trade secrets, confidential information, dies, designs, products, acronym, and contracts which belonged to Plaintiff." Count VIII alleged that the defendants "deceived Plaintiff by intentionally concealing and/or not disclosing to Plaintiff" that the defendants "were planning to use Plaintiff's trade secrets, confidential information, proprietary dies, designs, acronym and Product to compete with Plaintiff and to wrongfully convert his contracts and customers for their own benefit[.]" Count IX alleged that the defendants engaged in constructive fraud when they "breached a legal and/or equitable duty owned to Plaintiff to avoid converting Plaintiff's property and customers fraudulently[.]" Count X requested an injunction because "Defendants continue to illegally use his trade secrets, confidential information, designs, Product and proprietary dies in their business." Count XI alleged that Mr. Martin breached his employment contract when he converted Brass Metal's "contracts and customers for his own benefit." Count XII alleged that Mr. Martin breached a fiduciary duty that he

---

6. Brass Metal conducts business under its trade name, Advanced Columns and Rails Systems ("ACRS").

owed to Brass Metal when he "stole the Product and Product Methodology of Plaintiff in order to compete against Plaintiff." Brass Metal requested, among other things, $500,000 in compensatory damages, $1,500,000 in punitive damages, and an injunction against the defendants. Brass Metal filed subsequent amended complaints, but both parties assert that the first amended complaint "is the operative complaint" on appeal.[7]

On February 8, 2007, Mr. Johnson and E–J Enterprises filed a motion to dismiss Brass Metal's first amended complaint. The court denied this motion. On March 23, 2007, after a hearing, Brass Metal voluntarily dismissed count VI, "overt, false representations," from the first amended complaint.

On January 17, 2008, Brass Metal dismissed Parthenon, Mr. Martin, and Mr. Pantoulis as parties to the lawsuit. On February 21, 2008, E–J Enterprises and Mr. Johnson filed cross-claims against Parthenon, Mr. Martin, and Mr. Pantoulis, alleging claims for indemnification and contribution. Parthenon, Mr. Martin, and Mr. Pantoulis filed a motion to strike the cross-claims, arguing that they were not filed within 30

---

7. Plaintiff filed an original complaint and five amended complaints. The second amended complaint alleged claims against Parthenon, Mr. Martin, and Mr. Pantoulis. Brass Metal subsequently settled with these defendants.

On October 1, 2007, Brass Metal filed a third amended complaint against E–J Enterprises and Mr. Johnson, alleging additional counts for breach of contract, unjust enrichment, quantum meruit, and fraud. Prior to trial, Brass Metal voluntarily dismissed the claims pled in the third amended complaint.

On July 1, 2008, Brass Metal filed a fourth amended complaint, asserting, among other things, that Mr. Johnson "continues to be an individual Defendant in this lawsuit[.]" Brass Metal also amended its "prayer for relief," requesting, among other things, that E–J and Mr. Johnson, in his individual capacity, be held liable, jointly and severally, for $2,200,000 in compensatory damages, $2,000,000 in punitive damages, and injunctive relief.

On July 25, 2008, Brass Metal filed a fifth amended complaint amending its "prayer for relief" to incorporate the original and amended complaints. The court dismissed this amended complaint on the ground that it was not filed timely.

days of E–J Enterprises' answer and that "the Dismissed Defendants have been prejudiced by the Remaining Defendants' failure to assert their cross-claim[s] until after they had reached a settlement with the Plaintiff." The court granted the motion to strike the cross-claims.

On June 11, 2008, E–J Enterprises filed a motion for summary judgment. The court expressed doubt whether Brass Metal's evidence ultimately would persuade the jury, but it granted summary judgment only on counts eleven and twelve, which alleged claims solely against Mr. Martin. The court denied the motion on the other counts.

On August 8, 2008, appellees filed a motion *in limine,* requesting that Brass Metal be prohibited from arguing that appellees violated trade secrets laws:

> Brass Metal Products has stated in discovery that it intends to argue at trial that E–J Enterprises violated the Maryland Uniform Trade Secrets Act [MUTSA][8] and or common law trade secrets laws. However, Brass Metal Products has never alleged a claim against E–J Enterprises under [MUTSA] or common law trade secrets laws. The First Amended Complaint, the operative Complaint in this case, clearly does not allege a cause of action under [MUTSA] or common law trade secrets law.... Any attempt by Brass Metal Products to argue such claims at trial in this case would unduly prejudice E–J Enterprises, because such claims have not been pled, and would simply serve to confuse the jury as to the claims alleged and in dispute. Therefore, Brass Metal Products must be prohibited from arguing any claims or causes of action under [MUTSA] or common law trade secrets at trial....

Brass Metal did not file any response to the motion.

On August 11, 2008, prior to trial, the court heard argument on the motion. Initially, Brass Metal stated that "there is nothing in the [MUTSA] that says the Act must be specifical-

---

**8.** The Maryland Uniform Trade Secrets Act is set forth at Md.Code (2005 Repl. Vol.), §§ 11–1201–1209 of the Commercial Law Article.

ly" pled. When asked by the court how the determination of whether shapes or customer lists are trade secrets was relevant to the causes of actions that Brass Metal pled, Brass Metal argued that "trade secrets, under the Act, and in our case, is a lot broader; a lot broader." Counsel stated that pricing information, cost information, and the manufacturing process were duplicated and misappropriated.

The court then asked why Brass Metal thought it was "appropriate for [its] witnesses to draw the legal conclusions that these were trade secrets." Brass Metal expressly stated that using the term "trade secret" was not material to its case: "whether or not we actually use the actual words [trade secrets] . . . is not important to us." Brass Metal continued:

[W]e're not going to make any conclusions of law; we're going to present the evidence. And we're going to show them—tell them the story of what happened, and then . . . the jury has to decide, well, do we think that fits the definition? And do we think that fits some of the common law precedents that are still in place? Do we think that fits what the Act says? That's all we're trying to do. We don't even need to use the word[s], Your Honor.

Brass Metal then argued that, when the General Assembly enacted the MUTSA, "it broadened the availability of trade secrets." Brass Metal explained that "we are not preempted from suing under the common law" for misappropriation of trade secrets.

Appellees argued that Brass Metal should be precluded from arguing any claims regarding trade secrets because it had not asserted such a cause of action in its complaint. Appellees further argued:

The Plaintiff's secrets are attached to his—to all of his motions. There's nothing secret about it. The Plaintiff's secrets, Your Honor, are all these drawings that he has exposed to the world. The Plaintiff's secrets, Your Honor, are the things that he has allowed the Martin parties, [ ] Parthenon, to use, based on that agreement, that settlement agreement that we talked about in court on Friday. You

can't have a trade secret when you're allowing other parties to use it; when you've blessed it. And that's what he has done, and now he wants to come back and say, "I want—and I don't have to use the term 'trade secret' in front of a jury, but I want the jury to consider this a trade secret." Well, fundamentally, it fails based upon his own pleadings.

The court granted the motion *in limine:* "I'll direct that the Plaintiff is not permitted to refer to anything in this matter before the jury as a trade secret." The court stated that it would "deal with the specific issue of whether or not an instruction will be given at the end of the trial, but it's difficult to see how it would be given."

Trial commenced on August 11, 2008. James Burger, the President of Brass Metal, testified that, when he entered into the inventory agreement with E–J Enterprises, they verbally agreed that Mr. Burger would retain control of the dies and shapes that he designed. Mr. Burger acknowledged that he did not obtain patents on the designs of his railings. He further acknowledged that, in his deposition testimony, he stated that he did not pursue obtaining a patent because it was " 'very easy . . . to design the system.' " Mr. Burger denied encouraging employees with E–J Enterprises, including Eric Johnson, to sell railings based on his designs.

In January 2006, Mr. Johnson advised Mr. Burger that Mr. Martin had a "slick operation," and that Mr. Johnson had a "hunch" that Mr. Martin intended to compete with Brass Metal. In March 2006, Mr. Johnson again advised Mr. Burger that Mr. Martin would compete with Brass Metal.[9] Mr. Burger, however, was not aware that Mr. Martin had acquired "manufacturing equipment."

On July 21, 2006, Mr. Burger and his wife had dinner with Mr. Johnson and Mr. Johnson's wife. Mr. Burger had learned that E–J Enterprises was selling Brass Metal's aluminum

9. As indicated, *supra,* Mr. Martin first approached Mr. Johnson in 2005, and Mr. Johnson decided to sell Parthenon aluminum railings in March 2006.

railings to Mr. Martin and Parthenon, and he demanded that E–J Enterprises stop those sales. Mr. Johnson refused. When Mr. Burger asked Mr. Johnson why Mr. Johnson did not inform him that Mr. Johnson was selling his railings to Mr. Martin, Mr. Johnson responded that he "was respecting [Mr. Martin's] privacy as a customer." Nancy Kenealey, Mr. Burger's wife, testified that, following the dinner, her husband stated that his employee, Frank Haas, had warned him about Mr. Martin competing with his company.

Mr. Johnson, the President of E–J Enterprises, testified that E–J Enterprises was a wholesale metal distributor, which bought materials from manufacturers and distributed them to people who wanted the materials. From March 2006 to July 2006, his company provided "just-in-time inventory" services for Brass Metal and Parthenon. E–J Enterprises provided identical aluminum railings, based on Brass Metal's designs, to both companies from the same dies. Mr. Johnson explained that it was his company's policy that, "if you pay for a die, that material that comes from that die belongs to you." He testified, however, that Mr. Burger requested that E–J Enterprises sell railings to other manufacturers based on his designs in order to lower his costs, and it was only after Mr. Burger made this request that E–J Enterprises "tried to sell his stuff."[10] Although Mr. Johnson did not specifically ask for Brass Metal's permission to sell to Mr. Martin and Parthenon, he did notify Mr. Burger that Mr. Martin was building a manufacturing facility to compete with Brass Metal.

Mr. Johnson confirmed that, at the July 2006 dinner meeting, Mr. Burger requested that E–J Enterprises stop selling aluminum to Mr. Martin. Mr. Johnson testified that he responded: "You told me to sell it, Jim. You told me to sell." Mr. Burger responded, "[w]ell if I did, I don't want you to do it anymore." Mr. Burger further requested that Mr. Johnson wait until Mr. Martin requested additional railings and inform him that he could not order material from the dies. Mr.

---

**10.** As indicated, Mr. Burger denied that he advised E–J Enterprises to sell material from his shapes.

Burger believed that, by the time Mr. Martin had new dies built, "his customers [would] have gotten tired of his non-performance and he [would] be out of business." Mr. Johnson did not agree to Mr. Burger's request to stop selling to Mr. Martin.

Sharon Ann Johnson, Mr. Johnson's wife and a sales person at E–J Enterprises, testified that she was responsible for the Brass Metal account. In 1999 or 2000, she contacted Mr. Burger and proposed that E–J Enterprises provide Brass Metal with "just-in-time" inventory services. Rather than Brass Metal purchasing railings directly from a mill, which had to be paid for within 30 days and created storage problems for Brass Metal, E–J Enterprises would store 30 to 60 days "worth of material" for Brass Metal and release it to Brass Metal as needed. Brass Metal still had to pay for the material within 30 days of receiving it, but Brass Metal could purchase a smaller number of railings than if it purchased directly from a mill. Brass Metal's predictions regarding its need for railings eventually became "lopsided," however, and E–J Enterprises accumulated a significant amount of railings in stock, which for certain railing designs resulted in a two year supply instead of a supply for 30 to 60 days.

Ms. Johnson testified that in 2003 Mr. Burger gave E–J Enterprises permission to sell the railings he designed on the "open market." By selling more railings based on Mr. Burger's designs, E–J Enterprises could lower Mr. Burger's costs. Ms. Johnson explained the agreement:

> E.J. Enterprises had no restrictions on selling material of the d[i]es to any customer. And, Mr. Burger wanted, he said a royalty for selling his d[i]es, and we said we will get you a better price. That is how we are going to lower your cost is to get you a better price on the material. ... and that is how we are going to do it, by selling it to other customers, turning the inventory, getting a lower cost, and providing you with a better price.

Ms. Johnson testified that Mr. Burger gave her sample railings to provide to E–J Enterprises' "outside salespeople" so

that they could take the samples "to [their] customers to show them the product that he wanted [E–J Enterprises] to sell." Ms. Johnson then provided the samples to E–J Enterprises' sales representatives to sell to companies identified by Mr. Burger.

Frank Haas, Shop Foreman with Brass Metal, testified that he had worked for Mr. Burger for 24 years, and Mr. Burger designed railing shapes sold by Brass Metal. Mr. Haas testified that he had seen some similar shapes, but not the Slimline Cap. Between 2004 and 2006, Mr. Haas warned Mr. Burger "a couple of times" that Parthenon "would possibly" compete with Brass Metal.

William Polhamus, Sales Manager with E–J Enterprises, testified that, on January 15, 2006, Mr. Martin sent E–J Enterprises five or six drawings of aluminum railing parts. Mr. Polhamus forwarded the drawings to Pennex, which sent back architectural drawings and the price to buy "the die or the rights to the die." On April 17, 2006, Mr. Martin approved the final drawings from the mill. Soon after, Mr. Polhamus discovered that the parts Mr. Martin requested were identical to the railings that E–J Enterprises was holding in its inventory for Brass Metal. This presented an "ethical question" for Mr. Polhamus, *i.e.*, "selling a die that Mr. Burger had rights to, to someone else." Mr. Polhamus was told by Mr. Johnson, however, that E–J Enterprises had permission to sell the products it was holding for Brass Metal to other people "to gain a price advantage from mills, because [they would] be buying bigger tonnage."

E–J Enterprises eventually "concluded that if we had drawings . . . we could send them out, get a price on them, present the price to Mr. Martin at Parthenon, and have him agree to buy [the rights to those dies]." It determined that, once Parthenon paid for the rights to a die that was identical to that used to make the designs sold by Brass Metal, E–J Enterprises could immediately sell the identical railings in its inventory to Parthenon, as long as it could supply Brass Metal

with the inventory it needed. This arrangement eliminated the need for E–J Enterprises to store double inventory.

E–J Enterprises provided an invoice to Parthenon, which included a charge to pay for the rights for the die. After Parthenon paid the invoice, E–J Enterprises had Pennex create the dies, but E–J Enterprises immediately began to supply Parthenon with the railings from its inventory.

Thomas Martin testified that he was "an independent manufacturer's agent." In 2000, Mr. Martin, through his company Thomas Martin & Associates, entered into an agreement with Mr. Burger.[11] He would work as an independent contractor on sales and marketing, and any profits that he earned would go toward purchasing Brass Metal. This work entailed finding customers, quoting material, securing contracts, and following "it through to final execution."

In December 2003, Mr. Burger advised that he would not sell Brass Metal to Mr. Martin. Mr. Burger encouraged Mr. Martin to go into business with his son-in-law, Mr. Pantoulis, the owner of Parthenon. In February 2004, Mr. Martin purchased a 60% ownership interest in Parthenon.

Parthenon installed Brass Metal's railings until August 2006, when Mr. Burger required that Parthenon pay for railings on a cash on delivery basis. Parthenon did not "have the cash available" to purchase the railings thirty days to four months in advance of payment from the customer. Mr. Martin testified that, prior to purchasing railings from E–J Enterprises, he was assured by E–J Enterprises that Mr. Johnson had contacted an attorney and there would not be a problem using Brass Metal's shapes or dies. Mr. Martin acknowledged that he never advised Mr. Burger that he had purchased a

---

**11.** Mr. Martin testified that he was the sole employee of Thomas Martin & Associates. Mr. Martin did not consider himself an employee of Brass Metal. Although he acknowledged that he created a business card, which identified him as the Vice President of Sales and Marketing of Advanced Columns and Railings Systems, Brass Metal's trade name, he testified that he did not actually hold this position and the title served the limited "purpose of introduction to customers."

60% interest in Parthenon, or that he purchased aluminum railings from E–J Enterprises.

J. Jeffrey Jaros, an employee with Architectural Trim Products, testified that his company provides "metal architectural trim for companies that are building buildings." Mr. Jaros submitted a bid on a high-rise condominium project in Washington, D.C. for the "Palantine," and, in compiling this bid, he contacted Brass Metal to obtain an estimate on railings. Mr. Burger provided him with an estimate on the materials, and he referred Mr. Jaros to Mr. Martin to obtain an estimate on installation. Mr. Jaros provided Mr. Martin with all the information relating to this bid. Mr. Jaros, however, did not receive the contract. He did not know who received the contract, or why his bid was unsuccessful.

William Carter, Purchasing Supervisor with E–J Enterprises, testified that he was responsible for replenishing inventory to ensure that E–J Enterprises had its product in stock for its customers, including Brass Metal. One area of E–J Enterprises warehouse was referred to as "Burger Bay" because "a number of the extrusions" that were purchased for Brass Metal "were stored in that area." Mr. Carter recalled that he received an e-mail from another employee at E–J Enterprises indicating that the "New Jersey," one of Brass Metal's shapes, was the same as "Pinnacle," one of Parthenon's shapes.

Barbara Cooper, Inside Sales Supervisor for E–J Enterprises, testified that she received and entered the orders for aluminum railings from Brass Metal. Ms. Cooper testified that Mr. Burger had advised her that he wanted E–J Enterprises to sell railings based on his designs to other customers so that E–J Enterprises could pass on "better pricing" to him. From 2004 to 2006, E–J Enterprises sold railings made from Brass Metal's designs to customers other than Parthenon. Brass Metal received preferential pricing. When Brass Metal placed an order, E–J Enterprises billed Brass Metal $.20 per pound over cost. E–J Enterprises billed other purchasers "[s]ubstantially more" than that.

Rick Ferri, Vice President and General Manager of Contract Hardware, Inc., testified that in 2005 he submitted a bid to a general contractor for a project called Senate Square Towers in Washington, D.C. In assembling his bid, he contacted Brass Metal to obtain an estimate for railings. Mr. Ferri was notified in the Spring of 2006 that he lost the portion of the bid with respect to providing aluminum railings. Mr. Ferri subsequently saw "installers that had used to work" for Brass Metal installing railings, which included Mr. Pantoulis. Mr. Ferri, however, did not know the price of the winning bid.

Bruce O'Heir, a certified public accountant, testified as an expert in business valuation. He testified that, based on the information provided by Mr. Burger regarding contracts that Brass Metal did not receive, Brass Metal lost revenue of $1,876,347.

Timothy Gettings, Mr. Burger's cousin, worked as a salesperson with Pennex Aluminum Company, an independent aluminum extrusion company, from 1985 to 2005. Mr. Gettings testified that it was Pennex's policy not to reproduce an identical customer part that it had already created for another customer. Mr. Gettings explained that, when a customer submitted a drawing for custom aluminum extrusion, Pennex would determine whether the custom part could be produced in the factory according to the drawing. Next, it would go through a "d[ie] review" to determine whether the part "already existed within the Pennex organization." If Pennex determined that an identical die already existed, Mr. Gettings would contact the customer and advise the customer that Pennex could not create that part. The customer would then have to "either redesign the part, or they would have to obtain written consent from the other customer[.]" He acknowledged, however, that Pennex had in excess of 10,000 custom designs, and it was difficult to monitor.

With respect to the ownership rights to the dies, Mr. Gettings testified that, if the customer paid for the die, "they owned that steel that that profile was cut[.]" If Pennex paid

for the die, Pennex "owned the steel [and] the customer owned the rights to [Pennex] putting that in our equipment and producing a part from it." If a customer had paid for a die and decided to no longer conduct business with Pennex, Pennex "would put those d[ies] on a pallet, a skid, and ship them back to [the customer]." If, however, a customer decided to no longer conduct business with Pennex, and Pennex had paid for the die, the die would stay at Pennex's factory and, "[a]fter a number of years of inactivity, [Pennex] would sell it off for scrap value to a scrap dealer." Pennex would not use the die and extrude products for other customers.

At the end of Brass Metal's case, appellees moved for judgment. The court granted the motion. It stated as an initial matter:

> We have to keep in mind throughout everything I say, that there is no breach of contract action here. There has been testimony that there was an agreement of types between the parties. There is [a] difference as to the terms of the agreements or whether or not it was modified, but there is no breach of contract action.

The court went on to find that the shape and design of Brass Metal's railings were not "protected property," and it addressed the deficiency in proof with respect to each count.

At the conclusion of the hearing, the court made two additional findings:

> Let me state a couple of separate things, so everything is complete for the inevitable appeal. As to Eric Johnson, individually, had I denied the motion with one or more of the counts to E.J. Enterprises, I would have granted the motion with respect to Eric Johnson individually, because no matter what you view this E.J. as having done, I do not believe that the evidence has been sufficient to charge Mr. Johnson individually with that conduct.
>
> I would also note, I asked early on in this case as to who is the plaintiff, and are—is the plaintiff Brass Metals Enterprises, Inc.? And, I was told … the company was the plaintiff, not the individual Mr. Burger. And I noted in

several places in my notes, that which Mr. Lynch verbalized in the end, that Mr. Burger's testimony was entirely this was my design, this—his outrage over his artwork being taken was ... palpable. . . . And, granted, he testified as to he, in essence being Brass Metal's Products, and having one, one employee. However the real question is, whether or not that is sufficient to qualify as evidence of the plaintiff of record. And, perhaps I am being overly strict, but I do not think it is.

This timely appeal followed.

## STANDARD OF REVIEW

Maryland Rule 2–519(a) provides that "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party" and the "moving party shall state with particularity all reasons why the motion should be granted." When a defendant moves for judgment in a jury trial, "the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Md. Rule 2–519(b).

" 'We review a trial court's grant of a motion for judgment under the same analysis used by the trial court.' " *Cont'l Cas. Co. v. Kemper Ins. Co.*, 173 Md.App. 542, 546, 920 A.2d 66 (2007) (quoting *Barrett v. Nwaba*, 165 Md.App. 281, 290, 885 A.2d 392 (2005)). We "may affirm the grant of the motion for judgment only if ... we conclude that there was insufficient evidence to create a jury question." *Spengler v. Sears*, 163 Md.App. 220, 235, 878 A.2d 628 (citation omitted), *cert. denied*, 389 Md. 126, 883 A.2d 915 (2005).

## DISCUSSION

Before addressing each claim raised by Brass Metal, some general discussion of the record is warranted. Brass Metal's claims are based upon its assertion that it entrusted E–J Enterprises with confidential dies, die drawings, die rights, metallurgical formulas, trade secrets, and confidential information. The record, however, does not support this broad assertion.

Our review of the record, in the light most favorable to Brass Metal, reflects the following: (1) Brass Metal and E–J Enterprises entered into an agreement whereby E–J Enterprises would purchase railings from an aluminum extrusion mill and then supply the railings to Brass Metal as needed; (2) Brass Metal contacted mills and gave authority for E–J Enterprises to order railings from Brass Metal's dies; and (3) Brass Metal may have given E–J Enterprises drawings of its designs to enable E–J Enterprises to order additional dies.[12] Brass Metal points to no place in the record that supports its assertion that it gave E–J Enterprises dies, metallurgical formulas, trade secrets, or other confidential information. *See Van Meter v. State,* 30 Md.App. 406, 408, 352 A.2d 850 (an appellate court "cannot be expected to delve through the record to unearth factual support favorable to appellant and then seek out law to sustain his position."), *cert. denied,* 278 Md. 737 (1976).

With respect to the actual railings, Brass Metal contends that E–J Enterprises was not permitted to sell railings based on Brass Metal's designs to anyone else. Mr. Johnson, however, testified to the contrary, stating that Mr. Burger requested that E–J Enterprises sell Brass Metal's railings on the open market in order to lower his costs by enabling E–J Enterprises to order larger quantities of railings. Whether Brass Metal could have prevailed on a breach of contract claim is unknown; no such claim was made. On the claims that Brass Metal did assert, however, we conclude that the trial court properly granted E–J Enterprises' motion for judgment.

## I.

### Count I—Conversion

Brass Metal first challenges the circuit court's ruling granting judgment on its claim for conversion. It argues that

---

**12.** Brass Metal does not refer to any direct testimony that Brass Metal supplied E–J Enterprises with drawings of the railings, but there is evidence in the record that can be construed as such.

appellees were liable for the tort of conversion based on their actions in selling to "Plaintiff's competitor the dies, die rights, die drawings, and custom railings that had been entrusted to them by Plaintiff" and in using "the special authority entrusted to them by Plaintiff to order custom railings for the same competitor."

Appellees, on the other hand, argue that "Brass Metal Products failed to introduce any evidence to support its claim of ownership over" the disputed shapes, the dies, or the inventory. Appellees further argue that Brass Metal "failed to produce any evidence that E–J Enterprises or Mr. Johnson exercised dominion or control over any chattel belonging to Brass Metal Products that in any way interfered with Brass Metal Products' rights."

Conversion has been defined as " 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.' " *Darcars Motors of Silver Spring, Inc. v. Borzym,* 379 Md. 249, 261, 841 A.2d 828 (2004) (quoting *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 560, 731 A.2d 957 (1999)). Thus, in order to establish a claim for conversion, the plaintiff must first demonstrate that he or she had a property interest in property that was allegedly converted.

## A.

### Die Rights

Initially, we address Brass Metal's claim that it held a property interest in the designs or shapes of the aluminum railings that it sold to E–J Enterprises. The trial court properly rejected that argument and granted appellees' motion for judgment on that claim.

This claim asserts intangible property rights. In *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 731 A.2d 957 (1999), the Court of Appeals addressed whether a claim for conversion could be made for intangible property rights. The Court stated that "[t]he original common law rule was that a claim

for conversion could not be sought unless the plaintiff's property was tangible," but this "rule has been modified over time and certain intangible property interests may now be recovered through a conversion claim." *Id.* at 560, 731 A.2d 957. The Court held that "the tort of conversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document." *Id.* at 562, 731 A.2d 957. The Court refused, however, "to extend the tort further, to cover completely intangible rights...." *Id.* Moreover, it held that, even when intangible property rights were merged into a document, the tort of conversion would not be extended "to situations in which the relevant document itself has not been transferred." *Id.*[13]

■ Although Brass Metal cited *Allied Inv. Corp.* in its brief for the general proposition that a conversion claim exists for intangible property rights, it did not address the holding limiting such conversion claims. Brass Metal did not discuss, much less show, that the purported intellectual property rights at issue here were merged into a document that was transferred. Under these circumstances, Brass Metal's conversion claim regarding the designs and shapes of the railings fails.

We will, however, address the contentions raised by the parties. As explained below, Brass Metal fares no better.

Appellees argue that there can be no property right in the design of a product in the absence of a patent. They rely on *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). In that case, the Supreme Court stated that, when a product is unpatented and uncopyrighted, a State may not "prohibit the copying of the article itself or award damages for such copying". *Id.* at 232–33, 84 S.Ct. 784. *Accord Miracle Boot Puller Co. v. Plastray Corp.*, 84 Mich.

---

**13.** The Court stated that " 'it would seem preferable to fashion other remedies, such as unfair competition, to protect people from having intangible values used and appropriated in unfair ways.' " *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 562, 731 A.2d 957 (1999) (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 15, at 92 (5th ed. 1984)).

App. 118, 269 N.W.2d 496, 498 (1978) (in the absence of a patent, "an inventor has no common-law right to a monopoly of his invention. He has the right to make, use, and vend his own invention, but if he voluntarily discloses it, such as by offering it for sale, the world is free to copy and use it with impunity.").

Brass Metal does not address the Supreme Court's decision in *Sears*. Rather, it asserts that there are other ways "to protect rights in property," such as *"[c]ustom and usage* in the industry" and "agreement between the parties." This argument is unavailing.

The trial court rejected the argument that Brass Metal obtained a property interest in the shapes and designs of the railings based on custom and usage. The court found that "custom and usage" was used to determine rights pursuant to a contract rather than to create "the same protections as say patented property." The court went on to find that, even if custom and usage afforded the shapes "some protected status under the law," there was not sufficient evidence of custom and usage in this case. The court noted that "there has been no expert testimony" on the issue, and that "universal acceptance is what has to be demonstrated.... It must be so uniform and regular that the parties concern[ed] can be presumed to have known of the custom and acted in reference to it." The court concluded:

> I do not find the custom and usage has provided the shapes, or designs in this particular case with any special protections under the law. And, I will note, that once again, there was not a contract count that has been alleged between the two of them.

■ We agree with the trial court that Brass Metal did not obtain a property interest in the shapes and designs by custom and usage. Brass Metal cites no case holding that custom and usage in an industry can create property rights that give rise to a conversion claim. The sole case cited by Brass Metal is *Jarrett v. J. Staum & Sons Co.*, 138 Md. 217, 113 A. 720 (1921), but that case does not support that proposi-

tion. Rather, it addresses the admissibility of evidence of custom and usage to interpret the terms of a contract, *id.* at 220–21, 113 A. 720, the context in which custom and usage is usually discussed. *See Morris v. Ehlers,* 211 Md. 23, 29, 124 A.2d 776 (1956) (" 'The true test is that there must be in the contract something doubtful which can be explained by a usage or custom. . . . If the contract is made with reference to a usage and therefore omits the special particulars which are supplied by that usage, those particulars can be supplied by proof of the usage.' ") (citation omitted).

■ Even if custom and usage could create property rights, Brass Metal failed to present sufficient evidence at trial to survive the appellees' motion for judgment. To establish that custom and usage creates an enforceable right, the plaintiff must prove, by clear and convincing evidence, that the custom or usage was "definite, uniform, well established, and so general that knowledge of it may be presumed. . . ." *Wathen v. Pearce,* 175 Md. 651, 663, 3 A.2d 486 (1939). *Accord Eastern Assocs., Inc. v. Sarubin,* 274 Md. 378, 397–98, 336 A.2d 765 (1975) (" 'a custom or usage, to be valid and effective, must be actually known, generally known, or notorious.' ") (quoting 21 AM.JUR.2D *Customs and Usages* § 17 (1965)).

■ Here, Brass Metal failed to present sufficient evidence to establish that there was a uniform, definite, and well-established custom in the aluminum extrusion industry that a person who creates a die possesses a property right in the shapes created from the die. Mr. Burger testified that the three mills that he chose, Loxcreen, Tifton, and Bonnell, gave him assurances that his "designs were going to be protected, and the designs and profiles were not going to be copied or distributed anywhere else." Mr. Gettings, a former salesperson with Pennex, another mill, testified that Pennex would neither replicate an extrusion that it had created for another customer nor use the die to extrude products for another customer.[14] None of these witnesses, however, testified to the

---

**14.** Mr. Gettings' testimony was limited to Pennex's customs and policies.

general practice in the industry, and Brass Metal did not call any expert witnesses to testify on this issue.

■ Even in the light most favorable to Brass Metal, the evidence at trial merely established that four mills in the aluminum extrusion industry either recognized that a customer retained some right to the shape or design of the product it created for the customer or would agree to recognize such a right. This was insufficient to establish that this practice was " 'definite, uniform, well established, and so general that knowledge of it may be presumed.' " *Wathen,* 175 Md. at 663, 3 A.2d 486.[15] "Proof of the customs, habits or conduct of an individual is not admissible to show a general usage. . . ." *Id.* at 664, 3 A.2d 486. Thus, Brass Metal did not establish a property right based on custom and usage.

■ Finally, with respect to Brass Metal's claim that intangible property rights can be created by agreement, this bald assertion is made without any citation to legal authority to support the proposition. Accordingly, we will not address whether intangible property rights can be created by agreement. *See Anderson v. Litzenberg,* 115 Md.App. 549, 577–78, 694 A.2d 150 (1997) (refusing to address argument because appellants failed to cite any legal authority to support their contention of error).

In sum, there was no basis for a jury to find that Brass Metal held a property interest in the shapes and designs of its railings. Accordingly, the circuit court properly granted the motion for judgment on the conversion count with respect to the die rights.

## B.

### Aluminum Railings

We turn next to Brass Metal's argument that it owned the aluminum railings in E–J Enterprises' warehouse and that E–

---

**15.** Although the total number of mills in this industry is not clear, Mr. Johnson testified that E–J Enterprises had 192 aluminum extrusion mills in his company's database, and Mr. Burger mentioned a registry listing 169 mills.

J Enterprises converted its property when it sold the railings to Parthenon. Appellees argue that this claim should be rejected for two reasons. First, it was never argued below.[16] Second, appellees contend that E–J Enterprises' inventory was not the property of Brass Metal. Appellees argue that "Brass Metal Products had no ownership interest in any of those products until the products were delivered to Brass Metal Products and paid of[f] by Brass Metal Products."

In addressing this issue, the trial court stated:

The [aluminum railings] that [were] in the Burger Bay, the materials that actually, physically sat there, [were] E.J.'s to sell as they wish.

Now, maybe they had an agreement with Mr. Burger not to do that, maybe they did not, that count is not before us. They could sell that to who they wish because the shape itself was not protected, legally protected.

We agree.

The evidence at trial established that E–J Enterprises purchased aluminum railings from the mill, and it stored the railings until Brass Metal requested a delivery. Once the railings were delivered, Brass Metal was obligated to pay E–J Enterprises within 30 days. Under these circumstances, which were not disputed, E–J Enterprises owned the railings until it sold them to Brass Metal.

▮▮ Brass Metal contends, however, that appellees "were the bailees for hire of the custom railings." A bailment relationship occurs when a person "with legal title to property transfers possession of it to another pursuant to a contract of bailment...." 8A AM.JUR.2D *Bailments* § 51 (2009). *Accord Gen. Refining Co. v. Int'l Harvester Co., Inc.*, 173 Md. 404, 414, 196 A. 131 (1938). If Brass Metal had purchased the railings and contracted with E–J Enterprises to store its

---

**16.** This claim was raised below. In Brass Metal's opposition motion to appellees' motion for judgment, Brass Metal argued, with respect to the conversion claim, that E–J Enterprises "sold Martin/Parthenon Brass Metal aluminum railings [ ]made into the eight (8) shapes from the 'Burger Bay' without permission from Brass Metal or Mr. Burger."

inventory, there would have been a bailment. Here, however, E–J Enterprises bought the railings, and it was that company's property until Brass Metal ordered it. Although selling the railings to other people may, or may not, have been contrary to the agreement between the parties, it did not constitute conversion.[17] Thus, there was no error in the trial court's order granting appellees' motion for judgment on the conversion claim as its related to the railings.

## C.

### Dies

Brass Metal next contends that appellees converted the dies, *i.e.*, the actual metal tool that created the shapes of the aluminum railings. Brass Metal argues that an invoice issued by E–J Enterprises to Parthenon demonstrates that E–J Enterprises converted the dies when it sold them to Parthenon. Appellees counter that "the dies at issue were in the possession and control of mills that produced the metal products and E–J Enterprises never possessed or exercised control over the dies."

Initially, we do not agree that the evidence shows, even in the light most favorable to Brass Metal, that E–J Enterprises charged Parthenon for a die owned by Mr. Burger. To be sure, Brass Metal introduced an invoice into evidence, dated March 22, 2006, that billed Parthenon for eight different dies: (1) Die # PIN430 for $900.00; (2) Die # SLN4301 for $600.00; (3) Die # TP440 for $600; (4) Die # SNP4402 for $600.00; (5) Die # 5 SIDE–1 for $1450.00; (6) Die # PL4500 for $900.00; (7) Die # QD430 for $1650; and (8) Die # CNTR4302 for $900.00. The evidence, however, did not establish, as Brass Metal alleges, that the dies listed on this invoice were Brass Metal's dies. Although Mr. Polhamus initially testified that the invoice showed that it sold Parthenon the rights to dies,

---

**17.** In light of Mr. Burger's testimony that his agreement with Brass Metal included his desire to retain control of his shapes, E–J Enterprises' decision to sell the railings to Parthenon may have constituted a breach of contract between Brass Metal and E–J Enterprises, but a breach of contract claim was not before the court at trial.

designated "BRM," which meant Brass Metal, he subsequently testified that the items designated BRM were actual railings in stock. Brass Metal cites to no testimony indicating that the "Die" numbers on the invoice belonged to Brass Metal.[18]

Even if the evidence showed that E–J Enterprises charged Parthenon for a die belonging to Brass Metal, that would not establish conversion. As the trial court stated:

> And, my recollection of the evidence is that these dies, and Mr. Burger testified that that these were my dies, I bought the dies, I have that in my notes, I know that. And, as I understand it, in relying on Mr. Gettings, and in consideration of all the other evidence, this die was with that mill. And, E.J. could charge anybody they want for the die, if that is the way it worked out—but the fact of the matter is, if that is what they were doing, they were selling that which they did not have. And, that may be a problem between E.J. and Parthenon, but if E.J. did not have physical possession of the die, or the actual authority, or apparent authority to sell it itself, then no matter what they do, it is not a conversion.

Here, in the light most favorable to Brass Metal, Brass Metal failed to introduce any evidence to establish that E–J Enterprises wrongfully deprived Mr. Burger of possession of his dies. The court properly granted judgment on this claim.

## D.

### Customers & Contracts

 Brass Metal alleged in its complaint that appellees converted contracts and customer lists, and it reiterated that

---

**18.** The evidence shows that E–J Enterprises charged Parthenon a "die service charge," which it used to buy a die from the mill. Mr. Johnson admitted that it charged for "duplicate dies so that [it] would have an alternate source for Brass Metal Products and Parthenon." Even Mr. Polhamus testified that new dies were created. The "ethics question" to which Brass Metal refers concerned selling a die that was a "duplicate" of Mr. Burger's dies, *i.e.*, "selling a die that Mr. Burger had rights to, to someone else."

allegation in oral argument. It its brief, however, Brass Metal did not present any argument to support such a contention. As such, we will not address this claim. *See State v. Rivenbark*, 311 Md. 147, 160, 533 A.2d 271 (1987) ("The Court of Special Appeals need not address an issue that an appellant failed to argue in his brief.").

## II.

### Count II—Tortious Interference with Contract

Count II of the first amended complaint alleged that E–J Enterprises "deliberately interfered with and/or converted several contracts of Plaintiff...." The trial court granted appellees' motion for judgment on this count on three grounds: (1) there was insufficient evidence "that Brass Metal Products was itself was a party to any of the contracts"; (2) there was no "evidence of a breach of contract"; and (3) there was insufficient evidence of damages.

Brass Metal contends that the trial court erred in finding that there was "insufficient evidence to present to the jury of Plaintiff's damages and its contracts with third parties." Brass Metal argues that Mr. Burger "identified over twelve (12) current and prospective contracts valued at more than $1.8 million, that had been unlawfully interfered with by the Defendants in concert with Thomas Martin and Parthenon."

Appellees argue that the trial court properly found: (1) that Brass Metal "was never a party to the alleged contracts that it is claiming as damages"; (2) that "there was no evidence that E–J Enterprises in any way interfered with Brass Metal Products business or its ability to obtain contracts"; and (3) that "Brass Metal Products failed to present any evidence of damages at trial." It further argues that Brass Metal "improperly cites to *de bene esse* deposition transcripts of Mr. Pantoulis and Mr. Martin ... that are not part of the record in this case and were not entered into evidence nor proffered

for evidence at trial in the underlying case."[19]

The elements of a claim for intentional interference with contractual relations are as follows:

> "(1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom."

*Blondell v. Littlepage*, 185 Md.App. 123, 153–54, 968 A.2d 678 (quoting *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 503, 665 A.2d 297 (1995)), *cert. granted*, 409 Md. 46, 972 A.2d 861 (2009). This tort includes not only interference with existing contracts, but also of " 'prospective contractual relations.' " *Lake Shore Investors v. Rite Aid Corp.*, 67 Md.App. 743, 752, 509 A.2d 727 (1986) (quoting RESTATEMENT (SECOND) OF TORTS § 766B (1965)).

Although Brass Metal makes general assertions that appellees interfered with multiple contracts, its argument on appeal focuses on two contracts: (1) the Senate Square contract; and (2) the Saintsbury Plaza contract. With respect to Senate Square, Mr. Ferri, General Manager with a company that sells building products, testified that, in 2005, he obtained a bid from Mr. Martin on behalf of Brass Metal for aluminum railings for a high-rise project in Washington, D.C. Mr. Ferri

---

**19.** Appellees filed a motion to strike the transcripts of these two depositions and a nondisclosure agreement that were included in the record extract. Pursuant to Md. Rule 8–501(c), "[t]he record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal." Because we conclude, as discussed *infra*, that the court did not err in excluding these documents, we shall not consider these documents on the merits of this claim. We deny the motion to strike, however, because these documents were necessary to issues presented on appeal. *See Shell Oil Co. v. Ryckman*, 43 Md.App. 1, 4, 403 A.2d 379 (1979) (declining to consider issue because appellant included no evidence in the record extract to support argument).

testified that his company lost that portion of the bid. Mr. Ferri subsequently went to the work site and saw Mr. Pantoulis installing aluminum railings.

██ This evidence was insufficient to establish, at a minimum, the first, second, and third elements of a claim for tortious interference with contract. Specifically, there was no showing that Brass Metal had a contract. The evidence was merely that Mr. Ferri submitted a bid, but he did not obtain the contract. Moreover, there was no showing that E–J Enterprises had knowledge of this bid, or that E–J Enterprises induced the builder not to accept the bid from Mr. Ferri. Thus, there was no showing that appellees interfered with a contract regarding the Senate Square project.

With respect to the Saintsbury Plaza contract, Mr. Burger testified that Brass Metal was awarded a contract to provide aluminum railings for a three building apartment complex. The project started in 2004 and ended in 2006. Mr. Burger testified that the builder issued a purchase order for all three buildings, but it paid only $11,975 for "Building 3." A schedule of payments for each of the three separate buildings for this project was signed by Mr. Martin.[20] Mr. Martin testified, however, that Parthenon subsequently obtained a contract for Saintsbury Plaza. Mr. Martin testified that the value of the contract was worth between $50,000 to $70,000.

██ With respect to this claim, Brass Metal failed to present any evidence to establish the third element, *i.e.*, that E–J Enterprises intentionally induced the developer on the Saintsbury Plaza contract to breach its contract with Brass Metal and contract with Parthenon. Although E–J Enterprises had knowledge of Parthenon's contract for Saintsbury Plaza because Mr. Martin provided a list of contracts to E–J Enterprises for the purpose of ordering railings, there was no evidence that E–J Enterprises had any involvement in the

---

**20.** The payment schedule indicated that payment for "Building. # 1— 66 units" totaled $47,892.00, "Building. # 2 – 21 units" totaled $17,677.00, and "Building. # 3 – 24 units" totaled $11,975.00.

decision of Saintsbury Plaza to switch its contract from Brass Metal to Parthenon. Accordingly, we find no error in the court's ruling granting judgment on count II.

## III.

### Counts IV, V, VII, VIII, and IX

Brass Metal argues next that the circuit court erred in granting judgment on counts IV, injurious falsehood, count V, civil conspiracy, count VII, false representations, count VIII, non-disclosure or concealment, and count IX, constructive fraud and misrepresentation. Brass Metal argues that the court erred in granting judgment on these counts because "the lower court decided a *question of fact* in favor of Defendants, i.e., that there was no special or confidential relationship between the parties and, therefore no legal or equitable duty owed by Defendants to Plaintiff." Brass Metal further argues that "[t]he evidence clearly showed that a fiduciary and confidential relationship existed between the parties."

Appellees argue that Brass Metal "misrepresents that the Circuit Court's sole reason for entering judgment against Brass Metal Products ... was because no confidential relationship or duty existed between Brass Metal Products and E–J Enterprises and Mr. Johnson." They argue that the court's decision was "based on several factors," including that Brass Metal "did not have any property right in the Disputed Shapes, dies nor the inventory of E–J Enterprises," and that Brass Metal did not present "sufficient evidence of damages for the jury to make a ruling in the case."

### A.

### Count IV—Injurious Falsehood

Count IV of the first amended complaint alleged that appellees "falsely represented to customers, suppliers and extruders that the proprietary dies, designs and railings, and other products of Plaintiff's were properly available to Defendants for sale, which caused a financial loss to Plaintiff." The court

listed three reasons for granting judgment on this claim: (1) that a confidential relationship did not exist between the parties; (2) that there was "no evidence of special damages";[21] and (3) "to the extent that the falsehood argued by plaintiff had to do with the nature of the property, I have already dealt with that issue when I made my rulings as to custom and usage."

The Court of Appeals has summarized the claim of injurious falsehood as follows:

"Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage. The cause of action founded upon it resembles that for defamation, but differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases."

*Beane v. McMullen,* 265 Md. 585, 607–608, 291 A.2d 37 (1972) (quoting WILLIAM L. PROSSER, LAW OF TORTS 919–20 (4th ed. 1971)). *Accord Horning v. Hardy,* 36 Md.App. 419, 427, 373 A.2d 1273, *cert. denied,* 281 Md. 739 (1977).

Here, Brass Metal produced no evidence of any statement by E–J Enterprises that constituted a "derogatory" or "disparaging" statement about Brass Metal's property. Moreover, as indicated *supra,* one basis set forth by the trial court in granting judgment in favor of E–J Enterprises was that Brass Metal did not have a property interest in the shapes of the railings or the actual railings held in E–J Enterprises' warehouse. We have upheld that ruling, and Brass Metal does not dispute that this was a proper basis for granting judgment on the claim for injurious falsehood. Accordingly, we affirm the judgment of the circuit court on this count.

---

**21.** Earlier, in its discussion with respect to count II, interference with contracts, the court stated that Brass Metal had not produced sufficient evidence of damages to submit the issue to the jury.

## B.

### Count V—Civil Conspiracy

Count V of the first amended complaint alleged that the defendants conspired against Brass Metal "to accomplish the unlawful interference and conversion of Plaintiff's property . . . and each performed wrongful acts in furtherance of said conspiracy by deceiving customers and suppliers regarding ownership of trade secrets, confidential information, dies, Product and contracts, for their own benefit and with the intent of damaging Plaintiff's business." The court granted judgment on this claim, reasoning that civil conspiracy "falls" because "everything else has fallen."

A civil conspiracy is " 'a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.' " *Mackey v. Compass Mktg., Inc.,* 391 Md. 117, 128, 892 A.2d 479 (2006) (quoting *Hoffman v. Stamper,* 385 Md. 1, 24, 867 A.2d 276 (2005)). Civil conspiracy " 'is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.' " *Lloyd v. GMC,* 397 Md. 108, 154, 916 A.2d 257 (2007) (quoting *Alleco Inc. v. The Harry & Jeanette Weinberg Found., Inc.,* 340 Md. 176, 189, 665 A.2d 1038 (1995)).

Here, the conspiracy alleged was to convert Brass Metal's property. Because we have concluded that there was no unlawful conversion, there was no basis for the jury to find a civil conspiracy. The circuit court properly granted judgment on this claim.

## C.

### Count VII—False Representations

Count VII of the first amended complaint alleged that E–J Enterprises made false representations and "intentionally cre-

ated in the mind of customers, suppliers and extruders untrue and misleading material facts, including . . . the representation [that] the Defendants were rightfully entitled to trade secrets, confidential information, dies, designs, products, acronym, and contracts which belonged to Plaintiff." The trial court stated that there is "not really an action for something called false representations." Accordingly, it analyzed Brass Metal's claim in this count as alleging intentional misrepresentation.

A claim for "intentional misrepresentation" requires proof of the following elements:

(1) that a representation made by a party was false; (2) that either its falsity was known to that party or the misrepresentation was made with such reckless indifference to truth to impute knowledge to him; (3) that the misrepresentation was made for the purpose of defrauding some other person; (4) that that person not only relied upon the misrepresentation but had the right to rely upon it with full belief of its truth, and that he would not have done the thing from which damage resulted if it had not been made; and (5) that that person suffered damage directly resulting from the misrepresentation.

*B.N. v. K.K.,* 312 Md. 135, 149, 538 A.2d 1175 (1988) (quoting *Suburban Properties Mgmt. v. Johnson,* 236 Md. 455, 460, 204 A.2d 326 (1964)). *Accord Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.,* 398 Md. 529, 544, 921 A.2d 245 (2007).

Here, Brass Metal's claim appears to be that the intentional misrepresentations involved were statements that appellees could sell railings it held for Brass Metal to Parthenon. Because we have found that Brass Metal did not have a property right in these railings, the representation was not false. Even if it had been false, the evidence was that E–J Enterprises had consulted a lawyer, and therefore, there was no showing on the second element, *i.e.,* that the representation was known to be false or made with reckless indifference to the truth. Moreover, there was no showing that any misrepresentation was made to Brass Metal upon which Brass Metal relied that caused it to suffer damages. The elements of

intentional misrepresentation were not shown. Accordingly, the court properly granted judgment on this count.

**D.**

### Count VIII Non–Disclosure/Concealment

Count VIII of the first amended complaint alleged that E–J Enterprises "deceived Plaintiff by intentionally concealing and/or not disclosing to Plaintiff the fact that" Parthenon and Thomas Martin "were planning to use Plaintiff's trade secrets, confidential information, proprietary dies, designs, acronym [for Brass Metal's trade name] and Product to compete with Plaintiff. . . ." This count is based on Brass Metal's contention that E–J Enterprises knew that Mr. Martin was planning to compete with Brass Metal by using its products, and that E–J Enterprises, as the exclusive supplier of its products, owed a duty to Brass Metal to advise Mr. Burger of these plans. Brass Metal argues that E–J Enterprises had a duty to disclose this information because the business relationship between the two entities constituted a confidential relationship.

Appellees contend that the circuit court properly granted the motion for judgment on this count, arguing that there was no duty to disclose here. Although acknowledging that "a duty to disclose arises in certain relationships, such as a confidential or fiduciary relationship," appellees contend that no such relationship existed here. Rather, they contend that, "[a]t all times relevant to this case, Brass Metal Products and E–J Enterprises had a non-exclusive *vendor-vendee* relationship, and Mr. Johnson had no relationship with Brass Metal Products."

Ordinarily, non-disclosure of information does not create a cause of action unless a duty to disclose exists. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323, 389 A.2d 887 (1978). Such a duty may arise from certain relationships, such as a confidential relationship. *Hogan v. Md. State Dental Ass'n*, 155 Md.App. 556, 566, 843 A.2d

902 (2004).[22] The circuit court found as a matter of law that a confidential relationship did not exist between the parties, and therefore, neither E–J Enterprises nor Mr. Johnson owed a duty of disclosure to Brass Metal. The court stated:

> The term confidential relationships is often used in domestic cases, and cases involving family or internal organizational disputes. It—however, it has been equated to fiduciary relationship. A confidential relationship is a question of fact, based on matter[s] such as age, mental condition, education, business experience, health and degree of dependence. The suggestion here, is that … there is evidence that there is a confidential relationship between Eric Johnson and Jim Burger, and the fact of the matter is all the evidence that has been produced says that these people have known each other for a long time as business associates. That they have been to dinner a few times. But, you know, Mr. [Ferri] testified about going to lunch with customers too. And, they were business partners. They were not partners, that is an unfair characterization, and an incorrect characterization when dealing with this question. They were business associates, nothing more, nothing less. And, I do not think that a confidential relationship existed under the law.

Brass Metal argues that, in so ruling, the court erred for three reasons: (1) "[t]he court decided a question of fact that

---

**22.** In the absence of a duty to disclose, concealment is actionable if there is more than a mere "failure to reveal facts," *i.e.,* if, with the intent to mislead, there is a " 'statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise he would have observed.' " *Fegeas v. Sherrill,* 218 Md. 472, 476, 147 A.2d 223 (1958) (citation omitted). *Accord Rhee v. Highland Dev. Corp.,* 182 Md.App. 516, 525, 958 A.2d 385 (2008). Brass Metal argues on appeal that, even if appellees had no duty to disclose, appellees were liable for the tort of concealment. At trial, however, the sole argument advanced was that appellees were liable because they had a duty to disclose based on a confidential relationship. Thus, we will address only that issue on appeal. *See DeLeon v. State,* 407 Md. 16, 30, 962 A.2d 383 (2008) (arguments not raised, or ruled upon by the court, are waived for purposes of appeal.).

should have been left to the jury"; (2) "the court failed to take the evidence and inferences in the light most favorable to Plaintiff"; and (3) the evidence "did not support the finding by the court that there was no fiduciary, special and confidential relationship between the parties such that Defendants owed a duty to" Brass Metal.

We disagree. The trial court properly found that there was no confidential relationship between the parties that imposed a legal duty on appellees to disclose Mr. Martin's business plans.

The Maryland courts have discussed what constitutes a confidential relationship on several occasions. *See Buxton v. Buxton,* 363 Md. 634, 654–55, 770 A.2d 152 (2001) (" 'A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind.' ") (quoting 1 AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 2.5 (4th ed. 1988)); *Hogan,* 155 Md.App. at 566–67, 843 A.2d 902 ("a confidential relationship exists where 'confidence is reposed, and in which dominion and influence resulting from such confidence may be exercised by one person over another.' ") (quoting *Midler v. Shapiro,* 33 Md.App. 264, 268, 364 A.2d 99 (1976)); *McCoy v. Clark,* 21 Md.App. 198, 204, 319 A.2d 314 (1974) (" 'The doctrine of confidential relations ... exists where one party is under the domination of another, or where, under the circumstances, such party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare.' ") (citation omitted). Thus, a confidential relationship exists where one party has dominion over the other person, and the relationship is such that the person with greater influence is expected to act in the best interest of the other person. Confidential relationships can be found in attorney-client relationships, trustee-beneficiary relationships, and in some family relationships. *Upman v. Clarke,* 359 Md. 32, 42, 753 A.2d 4 (2000).

Neither party cited any Maryland caselaw addressing when a confidential relationship arises between two business

entities. Other courts, however, have stated that, "[g]enerally, business relationships are not confidential relationships." *Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1168 (11th Cir.1997). Where businesses are engaged in an "arm's length" transaction, a confidential relationship does not exist. *See GMC v. Bell,* 714 So.2d 268, 280 (Ala.1996) (no confidential relationship between General Motors dealership and its General Motors Acceptance Corporation because "[t]here is no question that the dealership and GMAC were, at all times, dealing with each other at arm's length."); *Bourgois v. Montana–Dakota Utils. Co.,* 466 N.W.2d 813, 819 (N.D.1991) ("A fiduciary or confidential or other special relationship does not ordinarily exist when business persons deal with each other at arm's length.").

To be sure, a confidential relationship may exist in a business relationship. Certain factors above and beyond a typical business relationship must exist, however. *See Exxon Corp. v. Breezevale, Ltd.,* 82 S.W.3d 429, 443 (Tex.App.2002) ("The fact that one businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required."). *See also MacBride v. Pishvaian,* 402 Md. 572, 583, 937 A.2d 233 (2007) (where lessor-lessee relationship was an "arm's-length contractual relationship," no confidential relationship existed absent "specific facts" "that would support a determination that the parties had a relationship built on trust and confidence such that appellant had a right to rely on appellee's good faith.").

For example, a confidential relationship may exist when there is a relationship independent of the business relationship. *See Gilmore v. Bell,* 223 Ga.App. 513, 478 S.E.2d 609, 611 (1996) (confidential relationship existed between home builder and home purchaser where the parties were "trusted friends, college fraternity brothers" and later business associates). Additionally, a confidential relationship may exist in a business relationship if "confidences are reposed by one person in another, who as a result gains an influence and superi-

ority over him." *Nolen v. Hall,* 130 Ill.App.2d 867, 266 N.E.2d 141, 145 (1970).

Ordinarily, the determination of whether a confidential relationship exists is a question of fact. *See Sanders v. Sanders,* 261 Md. 268, 276, 274 A.2d 383 (1971) ("In the absence of the legal presumption which arises from certain relationships ... the existence of a confidential relationship is a question of fact, not of law."). When the facts do not support a finding of a confidential relationship, however, the trial court may properly decide the issue as a matter of law. *Williams,* 120 F.3d at 1168.

Here, Brass Metal produced no evidence to establish that a confidential relationship existed between Brass Metal and E–J Enterprises. Rather, the evidence at trial established that both parties entered into an agreement for their own mutual benefit; Brass Metal sought to reduce the inventory it was required to keep and E–J Enterprises sought to increase its business. This was a typical "arms-length" transaction between two businesses to "further their own separate business objectives, rather than joined together to achieve a common business objective." *Williams,* 120 F.3d at 1168. *Accord Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 838 (2d Cir.1980) (" 'Parties dealing at arm's length, each seeking for himself the best advantage to be derived from a transaction, are not in confidential relationship.' ") (quoting *Sachs v. Cluett, Peabody & Co.,* 265 A.D. 497, 39 N.Y.S.2d 853, 856 (1943)).

Brass Metal directs our attention to several items of evidence that it argues created a jury question as to whether a confidential relationship existed between the parties. First, Brass Metal relies on an e-mail, dated February 21, 2002, from Mr. Harry Ottey, Brass Metal's vice president, to several other employees at E–J Enterprises. It stated:

We all want to do what is best for, and directed by, our customer. As I said to [Ms. Johnson], I want [Mr. Burger] to believe E–J is the easiest supplier there is to do business with. **He has put a lot of confidence in us** to practically

run his purchasing department, as well as his production dept.

(Emphasis added). Second, Brass Metal relies on the fact that it authorized the mills to sell railings from its dies to E–J Enterprises. Third, Brass Metal relies on Mr. Burger's testimony that he "felt betrayed" by E–J Enterprises' sale of the railings to Mr. Martin.

■■■ This evidence, even in the light most favorable to Brass Metal, was insufficient to establish a confidential relationship. An e-mail from an officer of E–J Enterprises that Brass Metal put a lot of confidence in the company to do the job it was retained to do does not establish a confidential relationship. "The mere fact that one reposes trust and confidence in another's integrity does not create a confidential relationship." *Williams,* 120 F.3d at 1168. *Accord Exxon Corp.,* 82 S.W.3d at 443 ("The fact that one businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required."). Thus, neither the e-mail nor Mr. Burger's feelings of betrayal established a confidential relationship. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962) ("mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship"). Moreover, that Brass Metal authorized the mills to sell the railings directly to E–J Enterprises does not establish a confidential relationship. Rather, it was a necessary step for the business relationship agreed to by the parties.

Appellees did not exercise the type of dominion and influence over Brass Metal that would establish a confidential relationship.[23] Accordingly, the trial court properly found that appellees had no duty to advise Brass Metal of Mr. Martin's actions, and it properly granted judgment on this claim.

---

**23.** Brass Metal did not argue below that a duty existed between the parties based on an agent and principal relationship.

**E.**

## Count IX—Constructive Fraud/Misrepresentations

Count IX of the first amended complaint alleged that E–J Enterprises "committed a constructive fraud upon Plaintiff by breaching a legal and/or equitable duty owed to Plaintiff . . . ." The Court of Appeals has described the tort of constructive fraud as follows:

> "Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud."

*Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 236 n. 11, 652 A.2d 1117 (1995) (citation omitted).

The trial court granted judgment on this claim on the ground that neither E–J Enterprises nor Mr. Johnson owed a duty to Brass Metal to advise of Mr. Martin's business. Because we have concluded that Brass Metal failed to produce sufficient evidence to create a jury question as to whether appellees owed a duty to Brass Metal, we affirm the court's judgment on count IX.

## IV.

## Trade Secrets

Prior to trial, appellees filed a motion *in limine*, contending that the court should prohibit Brass Metal from "arguing any claims or causes of actions under the Maryland Uniform Trade Secrets Act[ ] or common law trade secrets at trial" because it had not pled a cause of action under either theory. In discussing its ruling, the court discussed its view that the MUTSA preempted common law claims for misappropriation of trade secrets. The court then ruled that, because there was no claim for misappropriation of trade secrets in the complaint, Brass Metal was prohibited from using the term "trade

secret" when referring to the "shapes" of the railings and other evidence. With respect to whether the jury would be instructed on a claim for misappropriation of trade secrets, the court stated that "we'll deal with the specific issue of whether or not an instruction will be given at the end of the trial, but it's difficult to see how it would be given."

Brass Metal contends that the circuit court erred in finding "that, because Plaintiff did not specifically plead the [MUTSA] in its complaint," "it was deprived of proving a common law misappropriation of trade secret claim, or of using the term 'trade secret.'" Brass Metal further argues that the court erred in finding that the MUTSA "preempted *all* common law actions based on the misappropriation of trade secrets."

Appellees argue that the circuit court properly ruled: (1) "that Brass Metal was not permitted to use the legally conclusive term 'Trade Secret' when describing the disputed shapes and designs before the jury at trial"; (2) "that the Maryland Uniform Trade Secrets Act preempted the common law as it related to the claims at issue in this case"; and (3) "that Brass Metal Products was not entitled to proceed with a claim for misappropriation of trade secrets because it never pled a claim under the Maryland Uniform Trade Secrets Act and never alleged a claim for misappropriation of trade secrets." Appellees argue that, even if the MUTSA does not preempt common law claims for misappropriation of trade secrets, the error was harmless.

In addressing the claim, it is important to note that, although the court discussed its thoughts regarding the relationship between the MUTSA and a common law claim for misappropriation of trade secrets, the actual scope of its ruling was quite narrow. When asked to clarify its ruling, the court explained that the ruling merely prohibited Brass Metal from using the term "trade secret" in front of the jury:

> The motion *in limine* was to direct—a request that I direct that you not use the phrase "trade secret", or refer to the ... the shapes and the lists and all—everything else that you feel is a trade secret, that you not refer to them as

trade secrets. That you don't use the phrase in argument to the jury and presentation to the jury, and that you do not use it in questioning of any witness or production of any evidence before the jury. That's my understanding of the motion *in limine,* and I'm granting that.

■ Brass Metal's assertion that the ruling was error fails for two reasons. First, the record reflects that Brass Metal abandoned at trial the argument that it be allowed to use the term "trade secrets" in front of the jury. During the hearing on the motion *in limine,* when the court asked why Brass Metal thought it was "appropriate for [its] witnesses to draw the legal conclusions that" its designs these were trade secrets, Brass Metal expressly stated that using the term "trade secret" was not material to its case: "whether or not we actually use the actual words [trade secrets] ... **is not important to us."** (Emphasis added). Brass Metal continued:

> [W]e're not going to make any conclusions of law; we're going to present the evidence. And we're going to show them—tell them the story of what happened, and then ... the jury has to decide, well, do we think that fits the definition? And do we think that fits some of the common law precedents that are still in place? Do we think that fits what the Act says? That's all we're trying to do. **We don't even need to use the word,** Your Honor.

(Emphasis added). By conceding that it did not "need to use" the term "trade secret," and that using the term was "not important," Brass Metal abandoned its claims regarding use of the this term, and it is not preserved for appellate review. *See Long v. Burson,* 182 Md.App. 1, 23, 957 A.2d 173 (2008) (arguments not made below were abandoned).

Moreover, given that Brass Metal failed to assert any cause of action for misappropriation of trade secrets, under either the MUTSA or the common law, it was proper for the court to preclude Brass Metal from using the term "trade secret" when referring to the designs of the railings. Accordingly, the trial court properly granted the motion *in limine.*

## V.

## Evidentiary Rulings

Brass Metal argues that the trial court erred in several of its evidentiary rulings. Specifically, it points to the court's rulings precluding it from introducing into evidence: (1) *de bene esse* depositions; and (2) a non-disclosure agreement that it alleged was signed by Mr. Martin.

### A.

### Depositions

Brass Metal contends that the court erred in excluding the deposition testimony of Tom Martin, Christopher Martin, and Mr. Pantoulis. It argues that "the trial judge said that if the parties could agree on the use of one or more of the depositions, he would be amenable to admitting the evidence for the jury to see." Brass Metal contends, however, that even though the attorneys stated that they had reached an agreement, "the court disallowed all of the video depositions...." A review of the record, however, shows that Brass Metal's characterization of the court's ruling is not entirely accurate.

On the morning of trial, the court asked counsel whether the parties had reached an agreement regarding use of the depositions. Counsel for Brass Metal stated: "[W]e're moving, I think, in that direction." Counsel stated that "we both agree that the Chris Martin and the Pantoulis videotapes can be shown in their entirety." With respect to Tom Martin's deposition, counsel stated that he was working on an agreement. The court noted that there were "a minimum of one hundred and ninety objections" in the three depositions, many of which had "a substantial basis." The court further noted that there were references throughout the depositions relating to evidence of unrelated lawsuits, which had been "ruled inadmissible,"[24] and that all three of the depositions "are

---

24. On August 8, 2008, the court granted appellees motion *in limine*, precluding Brass Metal from introducing evidence relating to another lawsuit in Anne Arundel County, which had settled.

peppered with these very ugly exchanges between counsel that really can't go in front of the jury." Finally, the court stated that the scheduling order provided that any objections to video testimony "must be in writing no later than thirty days before trial," and the parties violated that provision of the scheduling order because the depositions were not taken until after that deadline passed.

The court then ruled that the depositions would not be admitted unless counsel reached an agreement regarding the proper use of the depositions:

> [I]f counsel can reach some kind of agreement on how to use this material, I'm happy to listen to it, because if counsel reaches an agreement that satisfies their interests, as long as it doesn't offend justice, I've got no problem with it. But given that counsel on their own decided to proceed in this manner outside of the Scheduling Order, outside of the Maryland Rules, and have produced something that the Court is not in a position to—to alter to make it usable, I'm not permitting the use of the video deposition in any form of Christopher Martin, Thomas Martin, and Anastasios Pantoulis.
>
> As I said, each of you has certain things in those things that are important. If you reach your own agreement, let me know; I'm happy to revisit. But absent that, they're not being used.

 " 'Generally, the standard of review with respect to a trial court's ruling on the admissibility of evidence is that such matters are left to the sound discretion of the trial court,' " and the court's decision will not be reversed " 'unless there is a showing that the trial court abused its discretion. . . .' " *Figgins v. Cochrane*, 403 Md. 392, 419, 942 A.2d 736 (2008) (quoting *Hall v. Univ. of Maryland Med. Sys. Corp.*, 398 Md. 67, 82–83, 919 A.2d 1177 (2007)). An abuse of discretion occurs " 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.' " *King*

*v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009) (quoting *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025 (1994)).

 We find no abuse of discretion in the trial court's ruling excluding the depositions. The court listed several valid reason for not admitting them into evidence. Moreover, the court stated that it would be willing to revisit the issue if the attorneys could reach an agreement regarding how the evidence properly would be presented to the jury. The parties have not directed us to any subsequent agreement by counsel. Appellant is not entitled to relief on this claim.

### B.

### Non–Disclosure Agreement

We address next the non-disclosure agreement between Mr. Martin and Mr. Burger, which provided that Mr. Martin would not "divulge, furnish, or make available, either directly or indirectly, to any person, firm, corporation, or other entity any proprietary information used by [Brass Metal]." Brass Metal states that it "was prepared to offer this document, along with other evidence, to show not only that Mr. Martin had violated this agreement by using insider information to take away Brass Metal business, but that he did this with the knowledge and complicity of E–J and Eric Johnson."

Again, the record does not support Brass Metal's claim. Indeed, Brass Metal's appellate contention is curious given its position below. At trial, Brass Metal indicated that it did not intend to rely on the agreement. When appellees brought up the agreement, Brass Metal objected, arguing that the agreement was irrelevant.

Prior to the start of trial, during the course of the discussion whether the *de bene esse depositions* would be admitted, the court addressed the admissibility of the non-disclosure agreement. The court stated: "I would have a real problem with that occurring ... unless the Martins had an opportunity to be heard on that, either through their depositions or individually." Counsel for Brass Metal stated: "[W]e're not particu-

larly relying [on], nor do we need to rely" on that agreement. After the court ruled that the depositions would not be admitted without an acceptable agreement between the parties, the court ruled that, "because of the issues related to the agency and non-disclosure documents as related to the Martins that were raised in the depositions, I think it would be manifestly unfair to—if the Plaintiff was permitted to produce those written documents, so I'll exclude that also."[25] The court subsequently stated that the non-disclosure agreement could not be used unless the parties reached an agreement.

▮ Again, Brass Metal points to no subsequent agreement by the parties. Moreover, when the issue of the non-disclosure agreement was revisited, Brass Metal argued that it was inadmissible.

Mr. Martin ultimately did testify at trial, and the issue of the non-disclosure agreement came up during his testimony. Appellees attempted to show Mr. Martin the non-disclosure agreement, and Brass Metal objected to the admission of evidence regarding this agreement. It argued that the non-disclosure agreement was irrelevant to the case:

> Your Honor, everything, with all due respect to [appellees' counsel], every tort that he mentioned has nothing, absolutely zero to do with these two so-called agreements [the agency and non-disclosure agreements]. These are, uh, there's an agency and a non-disclosure. They are directed directly at Tom Martin. Both of them—they are about that, the breach of that agreement, and they are not about any conspiracy, they're not about any of the other counts. Just totally disconnected from that, Your Honor.

The court, over Brass Metals' "strenuous objection," permitted appellees to question Mr. Martin about the non-disclosure agreement. Mr. Martin testified that his signature was on the agreement, but he did not sign the document.

---

**25.** The record reflects that Mr. Martin denied that he signed the non-disclosure agreement, and the court ruled that it would be unfair to admit the agreement without hearing testimony from Mr. Martin.

Under these circumstances, Brass Metal's claim regarding the admissibility of the non-disclosure agreement is not preserved. Brass Metal's argument on appeal, that it was "manifestly unfair" to exclude this agreement because it was "critical" evidence that should have been admitted, is inconsistent with its position at trial. Accordingly Brass Metal has lost its right to appeal this issue. *See Suter v. Stuckey,* 402 Md. 211, 224, 935 A.2d 731 (2007) (right to appeal may be lost " 'taking a position which is inconsistent with the right of appeal.' ") (citation omitted). Brass Metal is not entitled to relief on this claim or any other claim raised on appeal.

**JUDGMENT AFFIRMED. APPELLEES' MOTION TO STRIKE PORTION OF THE RECORD EXTRACT DENIED. COSTS TO BE PAID BY APPELLANT.**